UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KIRT GUYER, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>MGT CAPITAL INVESTMENTS, INC., ROBERT B. LADD, JOHN MCAFEE, ROBERT S. LOWREY, BARRY C. HONIG, JOHN STETSON, MICHAEL BRAUSER, JOHN O'ROURKE III, and MARK GROUSSMAN,<br><br>    Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Kirt Guyer ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by MGT Capital Investments, Inc. ("MGT Capital" or the "Company"), media and analyst reports about the Company, as well as the SEC's enforcement action against certain defendants in this matter, styled *SEC v. Honig, et al.*, No. 18-cv-08175 (Sept. 7, 2018 S.D.N.Y.). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded securities of MGT Capital from October 9, 2015 through September 7, 2018, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      From 2013 until April 2016, MGT Capital described itself primarily as "engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry." In May 2016, MGT Capital announced it was transforming itself into a cybersecurity company. MGT Capital currently purports to be engaged in bitcoin mining, with operations in the State of Washington and Sweden.

3.      Starting in 2015, Barry Honig ("Honig") and his associates chose MGT Capital to effectuate their *modus operandi*: buy cheap shares; obtain control over the company and its management; exercise that control in order to cause the company to engage in a misleading stock promotion that drives up the stock price and the trading volume of the company's shares; and finally, dump their shares for a profit in the inflated market.  Moreover, throughout the Class Period, Honig and his associate hid their control over the Company took numerous steps to conceal their involvement, and to perpetuate the false appearance that the Company was independent and controlled by its CEO.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants were engaged in an illegal  pump-and-dump scheme to artificially inflate MGT

Capital's stock price; (2) the Scheme Defendants (defined below) had a history of engaging in illegal conduct in connection with the purchase and sale of securities; (3) the Scheme Defendants were a "group", pursuant to Section 13 of the Exchange Act; (4) the Scheme Defendants exercised control over the Company; (5) the Company's acquisition of D-Vasive Inc. was part of Defendants' illegal pump-and-dump scheme to artificially inflate MGT Capital's stock price; (6) Defendants' illicit scheme caused MGT Capital to make false and misleading statements, which would result in governmental and regulatory scrutiny; (7) the scheme would result in the delisting of MGT Capital's stock from NYSE MKT; and (8) as a result, Defendants' statements about MGT Capital's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

5.      Beginning in September 2016, when the Company disclosed that it had received a subpoena from the SEC requesting "certain information from the Company," the truth concerning the Company was solely revealed to the market—namely, that Defendants had controlled the Company in order to effectuate an illegal pump-and-dump scheme. The full extent of Defendants' illegal acts was revealed on September 7, 2018, when the SEC issued a press release disclosing its recently filed complaint against the Scheme Defendants in connection with their actions concerning MGT Capital.

6.      Following the SEC's action against Honig and his associates, the Company's stock plummeted to $0.395 per share on September 10, 2018, over 91% below the stock's trading peak during the Class Period.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 9(a) and (f), 10(b), 20(a), and 20(b) of the Exchange Act (15 U.S.C. §§ 78i(a), 78i(f), 78j(b), 78t(a), 78t(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place within this District.

11.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## THE PARTIES

12.     Plaintiff, as set forth in the accompanying PSLRA Certification, acquired MGT Capital securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant MGT Capital is a Delaware corporation headquartered in Harrison, New York. MGT's common stock was listed on NYSE MKT from 2007 until October 19, 2016, when it was delisted. Its stock is traded over-the-counter ("OTC") under the symbol "MGTI.". At all relevant times, MGT Capital's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1

14.     Defendant Robert B. Ladd ("Ladd") was the Company's Chief Executive Officer ("CEO") from January 2012 until November 18, 2016, and reappointed CEO on August 16, 2017 until his leave of absence on September 10, 2018. Defendant Ladd was appointed interim Treasurer and interim Chief Financial Officer ("CFO") on December 8, 2015. Defendant Ladd is also a director.

15.     Defendant John McAfee ("McAfee") was appointed as the Company's Executive Chairman on September 9, 2016, and CEO on November 18, 2016, holding those positions until his resignation on August 15, 2017.

16.     Defendant Robert S. Lowrey ("Lowrey") has been the Company's CFO since his appointment on March 8, 2018.

17.     Defendant Barry C. Honig ("Honig") was a shareholder of MGT Capital.  Honig owns GRQ Consultants, Inc. ("GRQ"), and co-owns, with John Stetson ("Stetson"), HS Contrarian Investments, LLC ("HSCI").

18.     Defendant Stetson was a shareholder of MGT Capital. Stetson owns Stetson Capital Investments Inc. ("SCI"), and co-owns, with Honig, HSCI, of which he is the managing member.

19.     Defendant Michael Brauser ("Brauser") was a shareholder of MGT Capital. Brauser owns Grander Holdings, Inc. ("Grander").

20.     Defendant John O'Rourke III ("O'Rourke") was a shareholder of MGT Capital. O'Rourke owns ATG Capital LLC ("ATG").

21.     Defendant Mark Groussman ("Groussman") was a shareholder of MGT Capital. Groussman owns Melechdavid, Inc. ("Melechdavid").

22.     Defendants Ladd, McAfee, and Lowrey are herein referred to as the "Officer Defendants."

23.     Defendants Ladd, Honig, Stetson, Brauser, O'Rourke, and Groussman are herein referred to as the "Scheme Defendants."

24.     Defendants Ladd, McAfee, Lowrey, Honig, Stetson, Brauser, O'Rourke, and Groussman are collectively herein referred to as the "Individual Defendants."

25.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. Moreover, the Individual Defendants had the ability and opportunity to prevent their issuance or to cause them to be corrected prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS[1]

### Honig, Stetson, Groussman, Brauser, and O'Rourke
### Secretly Obtain MGT Capital Shares

26.     During 2015 and 2016, Honig and his associates used MGT Capital, a publicly traded shell, as a vehicle for a pump-and-dump scheme. Honig and his partners used many of the same tactics they had previously employed in another pump-and-dump scheme involving BioZone Laboratories Inc.  ("BioZone") (discussed below): they bought cheap shares, intending to exercise control over the management and polices of the company; exercised that control;

---

[1] The following allegations are taken from the SEC's complaint against Defendants, styled *SEC v. Honig, et al.*, No. 18-cv-08175 (Sept. 7, 2018 S.D.N.Y.).

orchestrated a misleading promotion of the company that drove up the stock price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market. Despite their control over various actions taken by MGT Capital, and their agreement to buy, hold and/or sell their shares in concert, Honig and his associates —including Groussman, Brauser, Stetson and O'Rourke —took numerous steps to conceal their involvement, and to perpetuate the false appearance that the company was actually being controlled by its CEO.

27.     In 2015, Honig and his associates began planning the pump-and-dump of MGT Capital's shares. Honig set the scheme in motion on September 26, 2015 when he informed Stetson that "[w]e need to put together a term sheet for MGT Capital," and outlined proposed terms of the arrangement. Honig directed Stetson to send the proposal to Ladd, MGT Capital's CEO. The deal contemplated the issuance of 2.8 million MGT Capital shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, Honig and his associates increased the likelihood that they could disguise their scheme to pump up the price of MGT Capital's shares in anticipation of a profitable sell-off to unsuspecting investors.

28.     Ladd was fully aware of Honig and his associates' combined interest in, and control over, the company, but failed to disclose it in MGT Capital's public filings. On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ." Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser OBAN [an LLC created by Stetson]." On October 5, 2015, Stetson provided MGT Capital with

the investors who would participate in the financing, which included GRQ (Honig), Melechdavid (Groussman), Grander (Brauser), ATG (O'Rourke) and SCI (Stetson).

29.     The Honig-led financing ultimately provided $700,000 to MGT Capital (the "October 2015 MGT Capital Financing"). On October 8, 2015, MGT Capital filed a Form 8-K disclosing that the company had "entered into separate subscription agreements . . .with accredited investors . . .relating to the issuance and sale of $700,000 of units . . ." In keeping with Honig's desire to conceal the large ownership stake of his team, Ladd did not disclose the investors' names in the Form 8-K.

**Defendants Pump-and-Dump MGT Capital in the Beginning of 2016**

30.     Having coordinated the accumulation of stock with Groussman, Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then secretly paid for a promotion that included materially misleading information and was supported by his own manipulative trading activity.

31.     On or around January 21, 2016, by which tune Honig, Groussman, Brauser, Stetson and O'Rourke had acquired at least 16.3% of the Company's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of MGT Capital.

32.     Shortly after the payment for the stock promotion, on February 3, 2016, an article was published online touting MGT Capital's positive prospects in social and real money gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by MGT Capital to write the article.

33.     After the article was published on February 3, 2016, there was a 7000% increase from the previous day's trading volume, and an intraday price increase of over 60%. As detailed

in the table below, Honig, Ladd, Stetson, and O'Rourke sold over 430,000 shares into this inflated market for proceeds of approximately $198,800:

| MGT Capital Pump and Dump Proceeds, Following February 2016 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2016)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** and **GRQ** | 2/3 — 4/6 | (231,050) | $123,154.87 |
| **Stetson** | 2/3 — 2/11 ( | (40,000) | $20,483.33 |
| **O'Rourke** and **ATG** | 2/3 – 2/9 | (64,366) | $15,960.72 |
| **Ladd** | 2/3-5/3 | (96,072) | $39,204.12 |
| **Total** | | **(431,488)** | **$198,803.04** |

### Defendants Continue Their Pump-and-Dump Scheme in May 2016

34.     Honig soon identified a potential acquisition target for MGT Capital that would give Honig and his associates another way to profit from their interest in MGT Capital. The proposed deal involved McAfee, who was a well-known cybersecurity innovator who had created a popular antivirus software bearing his name. O'Rourke took the lead at Honig's direction (and with the knowledge and consent of Groussman, Brauser and Stetson) in arranging a deal between MGT Capital and McAfee.

35.     On March 29, 2016, O'Rourke sent McAfee a term sheet for the asset purchase of his latest company, D-Vasive Inc. ("D-Vasive"), by an "NYSE listed company." On April 3, 2016, D-Vasive responded that it was interested in the transactions. That same day, O'Rourke wrote to Honig and asked Honig if he would "still want to pursue [McAffee] deal." After Honig replied to O'Rourke that same day "Yea!", O'Rourke introduced Ladd to McAfee on Apri14,

2016, to begin negotiating a transaction between the Company and McAfee's various business interests.

36.     Shortly thereafter, on May 8, 2016, MGT Capital and McAfee agreed to terms.

37.     On May 9, 2016, at 8:30 a.m., MGT Capital issued a press release announcing its merger with D-Vasive. In the release, Ladd misleadingly described McAfee's prior financial success. Specifically, Ladd falsely claimed that McAfee had "sold his anti-virus company to Intel for $7.6 billion". Yet, as Ladd knew or was reckless in not knowing, the sale of McAfee's namesake company to Intel at that price had occurred over a decade after McaFee's departure from that company.

38.     Knowing that Ladd's misleading announcement of the deal would be released later that morning, on May 9, 2016, Honig traded in MGT Capital stock to create the misleading appearance of market liquidity. In pre-market trading that morning, Honig bought and sold small quantities of Company stock dozens of tunes. Joining the effort to paint a false picture of legitimate market interest in the stock, Brauser, as well as Groussinan, and his entity, Melechdavid, engaged in coordinated trades in Company stock with Honig in pre-market trading that morning.

39.     That same day, StockBeast.com, a well-known Internet stock promotion website, published an article by an unnamed author entitled "MGT [Capital] Beastmode engaged — John McAfee driving the Bus." The StockBeast.com article touted the Company and highlighted the McAfee's involvement, repeating Ladd's materially false claim that McAfee had "sold his startup company to Intel for $7.6BB," and proclaiming: "This is big big big!"

40.     This promotion and Honig's, Brauser's and Groussman's manipulative trading on May 9 were effective in driving up both volume and price: on May 6, 2016 (the last day of trading prior to the promotion), MGT Capital had trading volume of 71,005 shares and a closing

price of $0.36. On May 9, 2016, the stock closed at $0.49 (representing an increase of 34 percent over the prior day's close) with trading volume of snore than 10 million shares. The trading volume for MGT Capital stock peaked at 109,384,614 on May 17, 2016 with a closing price of $4.15.

41.     In the days immediately following the announcement of the D-Vasive acquisition, Honig, Brauser, Stetson, Groussman and O'Rourke, pursuant to their agreement to buy, hold and/or sell their shares in concert, sold over 9.3 million MGT Capital shares, resulting in total proceeds of over $9.4 million:

| MGT Capital Pump and Dump Proceeds, Following May 2016 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2016)** | **Net Quantity Sold** | **Proceeds** |
| **Honig and GRQ** | 5/9 — 5/20 | (3,783,001) | $2,393,915.52 |
| **Brauser and Grander** | 5/9 — 5/18 | (2,137,668) | $3,839,295.64 |
| **Groussman and Melechdavid** | 5/9 — 5/11 | (1,415,870) | $999,873.56 |
| **Stetson and SCI** | 5/9 — 5/12 | (750,000) | $660,798.20 |
| **O'Rourke and ATG** | 5/9 — 5/16 | (750,000) | $990,661.97 |
| **Ladd** | 5/9 — 5/31 | (471,000) | $516,554.08 |
| **Total** | | **(9,307,539)** | **$9,401,098.97** |

**MGT Capital is not Honig's and his Associates Only Pump-And-Dump Scheme**

42.     MGT Capital was not Honig's first pump and dump scheme. Beginning 2010, Honig and his cohorts, including Brauser, Stetson and Groussman, purchased all outstanding shares of a publicly traded shell company, BioZone. After secretly obtaining control of the company, Honig and his associates, caused BioZone to engage in a reverse merger,[2] obtained capital through fraudulent means, drove the price of the stock higher by secretly paying for a

---

[2] Following the reverse merger, Biozone changed its name to Cocrystal Discovery.

misleading promotional campaign and by virtue of manipulative trading, and then in the winter of 2013, unlawfully sold their BioZone shares into the inflated market for proceeds of approximately $9,260,000.

43.     Following their seemingly successful pump-and-dump scheme involving BioZone, in 2014, Honig & Co. identified MabVax Therapeutics ("MabVax"), a publicly-traded shell company that was unencumbered by debt or pre-existing convertible debt, as a suitable vehicle for their next pump-and-dump scheme.  By 2015, Honig and his associates, including Brauser, Groussman, Stetson, and O'Rourke, obtained control over MabVax through multiple series of capital raises.

44.     In April 2015, Honing and his cohorts caused MabVax to engage in a stock promotion scheme. The promotion was successful. The Defendants listed below, acting pursuant to their agreement to buy, hold or sell their MabVax shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of aver $5.5 million, as detailed below:

| MabVax Pump and Dump Proceeds, Following Apri12015 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2015)** | **Net Quantity Sold** | **Proceeds** |
| **Brauser** | 4/13 — 6/30 | (576,400) | $1,600,826.76 |
| **Groussman and Melechdavid** | 4/6 — 6/23 | (99,616) | $342,984.59 |
| **Stetson and HSCI** | 4/6 — 6/30 | (1,080,379) | $3,607,248.91 |
| **O'Rourke and ATG** | 4/8 — 6/30 | (30,064) | $69,744.51 |
| **Total** | | **(1,786,459)** | **$5,620,804.77** |

45.    Honig then continued his stock promotion scheme in June of 2015, with additional paid promotional articles online, which contained materially false statements, including that a licensing deal was imminent, when it was not, and that there were near-teen therapy development events that could take the share price to $5, when in fact clinical trials were in early stages. Like its prior promotional articles, this promotion was successful. Pursuant to their agreement to buy, hold or dispose of their shares in concert, the Defendants listed below sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million, as detailed below.

| MabVax Pump and Dump Proceeds, Following June 2015 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2015)** | **Net Quantity Sold** | **Proceeds** |
| **Brauser** | 7/1 — 10/7 | (363,050) | $749,025.45 |
| **Groussman and Melechdavid** | 7/15 — 12/18 | (212,034) | $243,250.96 |
| **Stetson and HSCI** | 7/1 — 12/7 | (682,539) | $1,525,588.49 |
| **O'Rourke and ATG** | 7/1 — 12/31 | (179,690) | $235,253.20 |
| **Total** | | (1,437,313) | $2,753,118.10 |

### Defendants' False and Misleading Class Period Statements

46.    Throughout the Class Period, MGT Capital's stock was manipulated in furtherance of the pump-and-dump scheme and by Defendants Honig, Stetson, Groussman, Brauser, and O'Rourke's control of Defendant Ladd and the Company.

47.    The Class Period begins on October 9, 2015, when MGT Capital filed a Form 8-K with the SEC disclosing that on October 8, 2015, it had entered into separate subscription

agreements with accredited investors for the sale of $700,000 of units of MGT Capital. The

Form 8-K stated, in relevant part:

> On October 8, 2015, MGT Capital Investments, Inc. (the "Company") entered into separate subscription agreements (the "Subscription Agreement") with accredited investors (the "Investors") relating to the issuance and sale of $700,000 of units (the "Units") at a purchase price of $0.25 per Unit, with each Unit consisting of one share (the "Shares") of the Company's common stock, par value $0.001 per share (the "Common Stock") and a three year warrant (the "Warrants") to purchase two shares of Common Stock at an initial exercise price of $0.25 per share (such sale and issuance, the "Private Placement").

48.     The Form 8-K attached as Exhibits 10.1-10.3, a Form of Subscription Agreement,

a Form of Common Stock Purchase Warrant, and a Form of Voting Agreement.  The Form 8-K

did not attach executed copies of the agreements and did not otherwise disclose the names of the

group of the "accredited investors".

49.     The statements referenced in ¶ 48 above were materially false and/or misleading

because they misrepresented and/or failed to disclose the following adverse facts pertaining to

the Company's business and operations which were known to Defendants or recklessly

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or

failed to disclose that: (1) the subscription agreements were part of Defendants' illegal

pump-and-dump scheme to artificially inflate MGT Capital's stock price; (2) the "accredited

investors" had a history of engaging in illegal conduct in connection with the purchase and sale

of securities; (3) the "accredited investors" were a "group", pursuant to Section 13(d) of the

Exchange Act; (4) the "accredited investors" touted in the press release exercised control over

the Company;   (5) Defendants' illicit scheme caused MGT Capital to make false and misleading

statements, which would result in governmental and regulatory scrutiny; (6) the scheme would

result in the delisting of MGT Capital's stock from NYSE MKT; and (7) as a result, Defendants'

statements about MGT Capital's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

50.     Following the Company's October 2015 financing at the beginning of the Class Period, Honig, Stetson, Groussman, Brauser, and O'Rourke owned at least 16% of the Company's shares, in addition to warrants which, if converted, would have resulted in Honig, Groussman, Brauser, Stetson, and O'Rourke controlling at least 42% of the total common shares outstanding at the time. Given the agreement among the Scheme Defendants to buy, hold and/or dispose of their Company shares in concert; the group's direction of Company management and policies; and their combined share ownership, all of the members of the group were required to make Schedule 13D filings that they did not make. They did not make the appropriate filings so that the investing public would not discover their control over the Company, and to obscure from investors their planned pump-and-dump scheme.

51.     On April 14, 2016, MGT Capital filed a Form 10-K for the year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's full year 2015 financial results and position. The 2015 10-K was signed by Defendant Ladd. The 2015 10-K contained a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Ladd, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

52.     The 2015 10-K contained the following "[s]ecurities market risks":

> **_Our stock price and trading volume may be volatile, which could result in losses for our stockholders._**
>
> The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our Common stock could change in ways that may or may not be related to our business, our industry

or our operating performance and financial condition and could
negatively affect our share price or result in fluctuations in the
price or trading volume of our Common stock.   We cannot predict
the potential impact of these periods of volatility on the price of
our Common stock. The Company cannot assure you that the
market price of our Common stock will not fluctuate or decline
significantly in the future.

53.    The 2015 10-K provided the following table of "each person known by the
Company to be the beneficial owner of more than 5% of the outstanding Common stock":

|  | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
| --- | --- | --- |
| **5% beneficial owners** | | |
| Iroquois Capital Management, LLC [(1)(2)] | 1,787,204 | 9.9% |
| Barry Honig [(3)] | 1,557,823 | 8.6% |
| Robert Ladd [(4)] | 896,074 | 5.0% |

54.    The statements referenced in ¶¶ 51-53 above were materially false and/or
misleading because they misrepresented and/or failed to disclose the following adverse facts
pertaining to the Company's business and operations which were known to Defendants or
recklessly disregarded by them. Specifically, Defendants made false and/or misleading
statements and/or failed to disclose that: (1) Defendants were engaged in an illegal
pump-and-dump scheme to artificially inflate MGT Capital's stock price; (2) the "accredited
investors" had a history of engaging in illegal conduct in connection with the purchase and sale
of securities; (3) the "accredited investors" were a "group", pursuant to Section 13 of the
Exchange Act; (4) the "accredited investors" touted in the press release exercised control over
the Company;   (5) Defendants' illicit scheme caused MGT Capital to make false and misleading
statements, which would result in governmental and regulatory scrutiny; (6) the scheme would
result in the delisting of MGT Capital's stock from NYSE MKT; and (7) as a result, Defendants'

statements about MGT Capital's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

55.     On May 9, 2016, MGT Capital issued a press release announcing that agreed to acquire D-Vasive and that McAffee was to be appointed as Executive Chairman and CEO of MGT Capital, stating in part:

### John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology

*Mr. McAfee to be Chairman and CEO of renamed John McAfee Global Technologies*

**HARRISON, NY (May 9, 2016)** MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today that it has entered into a definitive asset purchase agreement to acquire certain technology and assets from D-Vasive Inc., a provider of leading edge anti-spy software. D-Vasive offers a powerful tool for protection from the proliferation of invasive apps by consumer products companies, social networks, financial institutions and others. These invasive apps can secretly turn on a phone's microphone and camera, as well as monitor geographic movements and access contacts. The D-Vasive technology operates in a unique way, allowing the user to manage and control the device's internal hardware. D-Vasive will be available shortly for Android and Windows platforms, followed by a release for Apple iOS.

In conjunction with the acquisition, MGT is pleased to announce the proposed appointment of John McAfee as Executive Chairman and Chief Executive Officer. Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion, and is actively involved in the development of new measures to protect individual freedoms and privacy. Mr. McAfee stated, "The enormous impact of cybersecurity on our lives requires the scale and resources of a public company. Our ability to continue to hire the best minds in the business will be vastly enhanced with a public platform. With the acquisition of D-Vasive technology as a starting point, we expect to grow MGT into a successful and major force in the space." MGT Capital also intends to change its corporate name to John McAfee Global Technologies, Inc.

Additionally, MGT has entered into a consulting agreement with Future Tense Secure Systems Inc., a technology incubator with investments in other applications requiring privacy, such as file

sharing and chat. It is contemplated by the parties that future collaborations or investments may occur going forward.

Closing of the acquisition is contingent on customary conditions including approval by MGT's stockholders. Major terms of the deal include the payment to D-Vasive Inc. stockholders of 23.8 million restricted shares of MGT stock and $300,000 in cash. The proposed share issuance is expected to amount to roughly 47% of the Company on a pro-forma fully diluted basis at closing…

56.    The press release described at ¶ 55 above was materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the sale of McAfee's namesake company to Intel for $7.6 billion had occurred over a decade after McAfee departed from that company; (2) the Company's acquisition of D-Vasive was part of Defendants' illegal pump-and-dump scheme to artificially inflate MGT Capital's stock price;  (3) Defendants' illicit scheme caused MGT Capital to make false and misleading statements, which would result in governmental and regulatory scrutiny; (4) the scheme would result in the delisting of MGT Capital's stock from NYSE MKT; and (5) as a result, Defendants' statements about MGT Capital's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

57.    On April 20, 2017, MGT Capital filed a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's full year 2016 financial results and position. The 2016 10-K was signed by Defendants Ladd and McAfee. The 2016 10-K contained a signed SOX certification by Defendant Ladd, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

58.     The 2016 10-K contained the following "Risks Associated with [the Company's] Stock Price":

> **_Our stock price and trading volume may be volatile, which could result in losses for our stockholders._**
>
> The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our common stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our common stock. We cannot predict the potential impact of these periods of volatility on the price of our common stock. The Company cannot assure you that the market price of our common stock will not fluctuate or decline significantly in the future.

59.     The statements referenced in ¶¶ 57-58 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants were engaged in an illegal pump-and-dump scheme to artificially inflate MGT Capital's stock price; (2) the Scheme Defendants exercised control over the Company;  (3) Defendants' illicit scheme caused MGT Capital to make false and misleading statements, which would result in governmental and regulatory scrutiny; (4) the scheme would result in the delisting of MGT Capital's stock from NYSE MKT; and (5) as a result, Defendants' statements about MGT Capital's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

60.     On April 2, 2018, MGT Capital filed a Form 10-K for the year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's full year 2017

financial results and position. The 2017 10-K was signed by Defendants Ladd and Lowrey. The 2017 10-K contained signed SOX certifications by Defendants Ladd and Lowrey, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

61.     The 2017 10-K contained the following "Risks Related to [the Company's] Stock":

> ***Our stock price and trading volume may be volatile, which could result in losses for our stockholders.***
>
> The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our Common Stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our Common Stock. We cannot predict the potential impact of these periods of volatility on the price of our Common Stock. The
> Company cannot assure you that the market price of our Common Stock will not fluctuate or decline significantly in the future.

62.     The statements referenced in ¶¶ 60-61 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants were engaged in an illegal pump-and-dump scheme to artificially inflate MGT Capital's stock price; (2) the Scheme Defendants exercised control over the Company;  (3) Defendants' illicit scheme caused MGT Capital to make false and misleading statements, which would result in governmental and regulatory scrutiny; (4) the scheme would result in the delisting of MGT Capital's stock from NYSE MKT; and (5) as a result, Defendants' statements about MGT Capital's business and

prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Slowly Emerges

63.     On September 19, 2016, pre-market, MGT Capital issued a press release announcing that on September 15, 2016, MGT Capital had received a subpoena from the SEC requesting "certain information from the Company."[3]

64.     On this news, shares of MGT Capital fell, $0.74 or over 22%, to close at $2.52 per share on September 19, 2016.

65.     On September 20, 2016, pre-market, MGT announced that the NYSE had informed the Company the previous day that it would "not approve the listing on the Exchange of the 43.8 million shares that the Company is required to issue in order to complete the closing of the D-Vasive merger."

66.     On this news, MGT Capital's stock continued to fall $0.63, or 25%, to close at $1.89 per share on September 20, 2016.

67.     On October 19, 2016, shortly before market-close, the NYSE MKT issued a press release "announc[ing] [] that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of MGT Capital Investments, Inc. (the 'Company') — ticker symbol MGT —from the Exchange.  Trading in the Company's common stock on the NYSE MKT will be suspended immediately." The press release further stated that "NYSE Regulation has determined that the Company is no longer suitable for listing" and had "commenced delisting proceedings pursuant to Section 1002(c) of the NYSE MKT Company

---

[3] MGT Capital later acknowledged in a press release dated September 7, 2018 that this subpoena was related to the SEC's investigation into Ladd's involvement in the pump-and-dump scheme.

Guide that applies when a company has sold or otherwise disposed of its principal operating assets, or has ceased to be an operating company."

68.     On October 20, 2016, MGT Capital issued a press release commenting on the NYSE MKT press release, stating in relevant part:

> ***The Company knows of no facts or circumstances that would lead NYSE Regulation to reach its unilateral decision***. The fact pattern actually produces the opposite conclusion: Notwithstanding the NYSE MKT's (also unilateral) decision to prevent the issuance of shares in connection with MGT's stockholder approved acquisition of D-Vasive and Demonsaw, MGT is indeed an operating company using any definition of those words. Moreover, the Company has not sold or disposed of its principal operating assets.
>
> It is the Company's position that the facts dramatically contradict the Exchange's decision. In recent months, MGT has acquired operating assets including two cybersecurity devices and bitcoin mining equipment and infrastructure. It currently has 15 employees and consultants, a newly signed 3-year lease for a tech center in Durham, NC, has announced the commercial release of its first cybersecurity product, and is currently a top U.S. producer of bitcoins. The bitcoin operations generate over $50,000 per month in gross profit, offsetting the $300,000 per month costs of operations. The company's preliminary balance sheet for September 30, 2016 consists of over $2.1 million in cash plus approximately $750,000 of marketable securities.
>
> ***The MGT Capitaloard of directors is comprised of experienced and intelligent experts in technology and Wall Street.*** These directors are also entrepreneurs, creating economic value and pioneering entire industries. Additionally, MGT has assembled several advisory boards, bringing together respected experts in various fields relating to bitcoin and cybersecurity. The Company's leadership team gets weekly requests to keynote top industry conferences on a global basis. The Company has over 16,000 stockholders in over 20 countries.
>
> ***"In our opinion, the conclusions of NYSE MKT are not only wrong and unfair, but insulting. Furthermore, this regulatory standard appears to be applied arbitrarily when comparing MGT to other issuers, or even to MGT itself over the years," stated John McAfee, Executive Chairman of MGT Capital.***
>
> ***"We urge stockholders to remember that in no way will our adherence to top corporate governance practices change as a result of the NYSE's action. These standards include having a majority of independent***

*directors on the board, maintaining timely filings for SEC disclosures, and having independent audits of our financial results," continued Mr. McAfee.*

"Also, our approach and desire to create a leading cybersecurity company will be unaffected by the delisting proceedings. The Company has not yet decided whether it will appeal the NYSE ruling; and MGT currently has a listing application in process at NASDAQ, as well as the OTCQX, although there can be no assurance of acceptance or timing," concluded Mr. McAfee.

(Emphasis added.)

69.     On October 21, 2016, the next trading day following this news, MGT Capital's stock fell $1.07, or over 45%, to close at $1.29 per share.

70.     The Class Period ends on September 7, 2018, when the SEC issued a press release entitled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes." The SEC made its complaint against Ladd, and others, available on its website. The press release stated, in relevant part:

> The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.
>
> *According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes. Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes. Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors.*

"As alleged, Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets," said Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement. "They failed to appreciate, however, the SEC's resolve to relentlessly pursue and punish participants in microcap fraud schemes."

The SEC's complaint, which was filed in federal district court in Manhattan, charges Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman, Frost, Elliot Maza, Robert Ladd, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., OPKO Health Inc., Frost Gamma Investments Trust, Southern Biotech Inc., and Stetson Capital Investments Inc. with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief.

(Emphasis added.)

71.     On this news, shares of MGT Capital fell $0.195, or over 33%, during the next two trading days to close at $0.395 per share on September 10, 2018, damaging investors.

72.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of MGT Capital during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE and OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)      whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)      whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

78.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

79.      Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      the Company's securities are traded in efficient markets;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NYSE and OTC, and was covered by multiple analysts;

(f)        the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)        Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

80.        Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

81.        Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

82.        Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

83.        This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

84.        During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the

other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

85.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

86.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.   Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.   In

28

addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

87.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

88.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

89.     During the Class Period, the Company's securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct.  Had

Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Company's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

90.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

91.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 9(a) and (f) of the Exchange Act
### Against the Scheme Defendants

92.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

93.    During the Class Period, the Scheme Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (2) engaged in a scheme to inflate the price of MGT Capital's securities; and (3) mislead and caused Plaintiff and other members of the Class to purchase MGT Capital's securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

94.     The Scheme Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of MGT Capital's securities in an effort to maintain artificially high market prices for MGT Capital's securities in violation of Sections 9(a) and 9(f) of the Exchange Act. The Scheme Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

95.     By virtue of the foregoing, the Scheme Defendants made statements which were at the time and in the light of the circumstances under which they were made, false or misleading with respect to the value of MGT Capital securities which Defendants knew or had reasonable ground to believe were so false or misleading.

96.     The Scheme Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make said false or misleading statements with respect to the value of MGT Capital securities which Defendants knew or had reasonable grounds to believe were so false or misleading.

97.     Each of the Scheme Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Scheme Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Scheme Defendants, by virtue of his responsibilities and activities as a senior officer, and/or director of the Company, and/or agent of

the Company was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Scheme Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Scheme Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

98.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding MGT Capital's true value and the Scheme Defendants' price manipulation, which was not disclosed by the Scheme Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired MGT Capital securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

99.     By virtue of the foregoing, the Scheme Defendants violated Section 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a) and 78i(f).

100.     As a direct and proximate result of Count II Defendants' conduct as described herein, Plaintiff has suffered significant damages and is entitled to such damages from the Scheme Defendants, jointly and severally.

101.     This action was filed within one year of discovery of the fraud and within three years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT III

**Violation of Section 20(a) of the Exchange Act**
**Against the Officer Defendants**

102.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

103.    During the Class Period, the Officer Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

104.    As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

105.    Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Officer Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Officer Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

106.    Each of the Officer Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Officer Defendants had the power to direct the actions of, and exercised

the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Officer Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

107. By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## COUNT IV

### Violation of Section 20(b) of the Exchange Act Against Honig, Brauser, O'Rourke, Stetson, and Groussman

108. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

109. By their conduct as alleged above, Count IV Defendants directly and indirectly, acted through and used another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

110. In acting through and using another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Count IV Defendants acted intentionally, knowingly or with severe recklessness with respect to the truth.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:   October 9, 2018

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email:   jalieberman@pomlaw.com
Email:   ahood@pomlaw.com
Email:   jlindenfeld@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email:   pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
Email:   peretz@bgandg.com

*Attorneys for Plaintiff*

35

**Submission Date**

2018-10-04 13:19:10

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I  make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against MGT Capital Investments, Inc. ("MGT" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire MGT securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired MGT securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in MGT securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

## Name

**Print Name**

Kirt Guyer

## Acquisitions

**Configurable list (if none enter none)**

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
|:---:|:---:|:---:|
| 12/26/2017 | 97 | 5.02 |

## Sales

**Configurable list (if none enter none)**

| Date Sold | Number of Shares Sold | Price per Share Sold |
|---|---|---|
| none | | |

# Documents & Message

**Upload your brokerage statements showing your individual purchase and sale orders.**



**Signature**



**Full Name**

Kirt Guyer



**MGT Capital Investments, Inc. (2018) (MGTI)**                                        **Guyer, Kirt**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|----------------------|----------------------|
| 12/26/2017 | Purchase | 97 | $5.0200 |