## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER OH, KEVIN JOO HOON KOO, SAM KOO, DAE C. PAEK, AND MONICA PAEK, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MGT CAPITAL INVESTMENTS, INC., and ROBERT B. LADD, <br><br> Defendants. | C.A. No. 1:18-cv-09228 <br><br> Hon. Edgardo Ramos <br><br> <u>AMENDED    COMPLAINT    FOR VIOLATIONS   OF   THE   FEDERAL SECURITIES LAWS</u> <br><br><br> <u>CLASS ACTION</u> <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Court-Appointed Lead Plaintiffs Peter Oh, Kevin Joo Hoon Koo, Sam Koo, Dae C. Paek, and Monica Paek ("Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other persons or entities who purchased or otherwise acquired securities of MGT Capital Investments, Inc. ("MGT" or the "Company") from October 9, 2015 through September 7, 2018, both dates inclusive (the "Class Period").

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the ongoing independent investigation of Court-appointed Lead Counsel, Levi & Korsinsky, LLP ("Counsel"). This investigation includes, among other things, a review and analysis of: (i) public filings by MGT with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movements and pricing data; (v) transcripts of conferences with MGT senior

management; (vi) consultation with relevant experts and consultants; (vii) other publicly available material and data identified herein; and (viii) the ongoing SEC enforcement action against several of the relevant non-parties and a defendant identified herein, styled *SEC v. Honig, et al.*, No. 18-cv-08175 (Sept. 7, 2018 S.D.N.Y.) (the "SEC Action"). Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting Plaintiffs' allegations are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Plaintiffs believe that further evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     At its core, this action represents the worst of conniving investors and self-interested members of Company management, who used their positions to manipulate public issuers and the reporting requirements of the federal securities laws to reap a financial windfall, all to the detriment of members of the unsuspecting investing public, like Plaintiffs.

2.     Here, the Defendants presided over a scheme to hide the fact that the Control Group (as defined herein) was secretly manipulating the actions of MGT to: (i) enter into a sweetheart investing agreement that allowed for members of the Control Group to each individually acquire large blocks of the Company's stock, along with exercisable warrants that were designed to hide their control over the Company and allow each to leverage the eventual inflation of the Company's stock price into millions of dollars of illicit profits and (ii) engage in the publication of multiple promotional articles, paid for by the Company, which materially misled investors and drove outside interest into MGT, providing an audience for the Scheme Group's (as defined herein) stock sales.

3.     Further, certain members of the Control Group, with the knowledge of forthcoming positive news about the Company and/or the issuance of a promotional article, engaged in a series of coordinated pre-market trading to give the appearance of greater interest in MGT stock than actually existed at that time, all to further dupe members of the investing public.

4.     The purpose was simple: to artificially inflate MGT's stock price and allow the Control Group to exit their positions, taking millions of dollars in quick profits in exchange for the relatively small upfront investment.

5.     For his part, Defendant Ladd, then the Chief Executive Officer and Interim Chief Financial Officer of MGT, and one of just two Company employees, went along for the ride— mispresenting the ownership interest of the Control Group to hide the relationship and agreement among its members to act in concert, while also taking hundreds of thousands of dollars in profits from stock sales timed to leverage the artificial inflation created by the promotional scheme.

6.     The truth about the Control Group's pump-and-dump tactics began to surface in September 2016 when the Company announced its receipt of an SEC subpoena.  Thereafter, Teri Buhl, a self-described "financial investigative journalist" who was named by *The Huffington Post* as one of "The Most Dangerous People in Financial Media"[1] began publishing several articles on her site linking the SEC probe to Honig and his affiliates and questioning whether Honig was involved in an undisclosed control group.

7.     The Scheme Group officially fractured in 2017 when Honig, along with several other members of the Control Group, brought suit against the Company and Defendant Ladd,

---

[1] *See* Brown, Joshua M., "The 25 Most Dangerous People in Financial Media," *The Huffington Post*, *available at* https://www.huffingtonpost.com/joshua-m-brown/best-financial-journalists_b_1605584.html?slideshow=true#gallery/5bb2c63ce4b0480ca65bce38/2 (last accessed March 15, 2019) ("[I]f you're up to no good in the financial services biz, you want Teri and her instinct for fraud-busting to be as far away from you as possible").

alleging that the each failed to adequately enrich the members of the Control Group by effecting certain transactions and asset purchases that the Control Group itself had set up.

8.     Additionally, Honig sued Defendant Ladd and Ms. Buhl, claiming that the two had conspired to slander Honig through Buhl's reporting, as she had published several subsequent articles connecting MGT to Honig and the possibility of clandestine and nefarious pump and dump activities.

9.     Ms. Buhl's reporting was substantially corroborated when, on September 7, 2018, the SEC announced that it had filed a complaint against the Scheme Group, among others, alleging that they had improperly exploited MGT securities for illicit financial gain amounting to more than $9 million, all in violation of the federal securities laws.

10.     As alleged herein, each of the defendants acted with the requisite scienter during the Class Period, with defendants MGT and Ladd knowingly concealing the truth about the existence of the Control Group to artificially prop up the Company's stock price, and Defendant Ladd engaging in a scheme or artifice with the Scheme Group designed to enrich himself through the manipulation of MGT stock.

11.     As a result of the violations of law alleged herein, Plaintiffs and the Class have been injured.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise pursuant to Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and SEC Rule 10b-5 promulgated therein, 17 C.F.R. § 240.10b-5.

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act, 15 U.S.C. §78aa.  In connection with the acts, conduct and other

wrongs alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. During the Class Period, MGT traded on both the NYSE MKT and the OTC Link.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District.

## THE PARTIES

### A.  Plaintiffs

15.     Court-appointed Plaintiffs purchased MGT securities during the Class Period at artificially-inflated prices and were damaged thereby, as previously set forth in their PSLRA Certifications, filed with the Court on November 27, 2018 (ECF No. 13-1), incorporated herein by reference.

### B.  Defendants

16.     Defendant MGT is a Delaware corporation formerly headquartered in Harrison, New York before relocating to Durham, North Carolina at the beginning of 2017. MGT's common stock was listed on NYSE MKT from 2007 until October 19, 2016, when it was delisted. Its stock is traded over-the-counter ("OTC") through the OTC Link under the symbol "MGTI."

17.     Defendant Robert B. Ladd ("Ladd") was the Company's Chief Executive Officer ("CEO") from January 2012 until November 18, 2016, and reappointed CEO on August 16, 2017 until his leave of absence on September 10, 2018. Defendant Ladd was appointed interim Treasurer

and interim Chief Financial Officer ("CFO") on December 8, 2015. Defendant Ladd is also a member of the Company's Board of Directors.

18. Defendant Ladd possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications.

19. Moreover, Defendant Ladd had the ability and opportunity to prevent these communications' issuance, or to cause them to be corrected prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of his position with the Company, and his access to material information available to him but not to the public, Ladd knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and misleading. Ladd is directly liable for the false statements and omissions pleaded herein.

## C. **Relevant Non-Parties**

20. Non-Party Barry C. Honig ("Honig") was a shareholder of MGT. Honig owns GRQ Consultants, Inc. ("GRQ"), and co-owns, with John Stetson ("Stetson"), HS Contrarian Investments, LLC ("HSCI").

21. Non-Party Stetson was a shareholder of MGT. Stetson owns Stetson Capital Investments Inc. ("SCI"), and co-owns, with Honig, HSCI, of which he is the managing member.

22. Non-Party Michael Brauser ("Brauser") was a shareholder of MGT. Brauser owns Grander Holdings, Inc. ("Grander").

23. Non-Party John O'Rourke III ("O'Rourke") was a shareholder of MGT. O'Rourke owns ATG Capital LLC ("ATG").

24.     Non-Party Mark Groussman ("Groussman") was a shareholder of MGT. Groussman owns Melechdavid, Inc. ("Melechdavid").

25.     Non-Parties Honig, Stetson, Brauser, O'Rourke, and Groussman are sometimes referred to herein as the "Control Group."

26.     Defendant Ladd and Non-Parties Honig, Stetson, Brauser, O'Rourke, and Groussman are referred to herein as the "Scheme Group."

## SUBSTANTIVE ALLEGATIONS

### A.  Background of MGT

27.     Since going public in 2000, MGT has undergone a series of name changes and business focus pivots.

28.     In 2000, the Company was named HTTP Technology, Inc. and focused on "strategic acquisitions in Internet and Internet-related businesses." In 2002, it became Medicsight, Inc., focusing on medical imaging technology. In 2007, it became MGT Capital Investments, Inc., a holding company focused on health-care information technology.

29.     Yet through it all, one constant has been the Company's inability to generate any significant revenues to fund its operations.  As stated by MGT in its annual report filed on Form 10-K on April 2, 2018:

> Our commercial results have been limited. Historically, the Company has not generated significant revenues to fund its operations, and the Company cannot be certain that revenues will be sufficient to fund operations for the foreseeable future. The Company's primary source of operating funds since inception has been debt and equity financings.

30.     Ladd had joined MGT in 2010 as a director and was appointed Interim President and CEO in February 2011 and President and CEO in January 2012.

31.     Following multiple notices of potential delisting and a resignation of the CEO of Medicsight (then the Company's most important subsidiary) due to undisclosed related-party transactions, Defendant Ladd opted to take the Company in a new direction in 2012, pivoting towards the online and mobile game and casino space.

32.     Under Ladd's direction, MGT began acquiring intellectual property for online gaming platforms. Beginning in 2013 and up to as late as April 2016, the Company described itself primarily as "engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry."[2]

33.     The key to MGT's gaming-based portfolio was DraftDay.com, a fantasy sport business and software platform that MGT acquired in April 2014 for $600,000 in cash and 100,000 shares of common stock that generated meaningful revenue for the Company in 2014. Subsequently, the Company, faced with substantial doubts about its ability to continue as a going concern and a plummeting stock price, was forced to sell DraftDay in September 2015 for approximately $5.5 million.

34.     Armed with the DraftDay sale proceeds to fund ongoing operating expenses (expenses which, notably, produced little to no revenue), the Company looked to the equity markets to provide the funds necessary to make an acquisition to propel MGT forward.  It was then that a potential source of financing came forward in the form of Barry Honig and his group of unnamed "accredited investors."

B.  **Barry Honig and his Pump and Dump Stock Scheme**

35.     As would later come to light as a result of the SEC's investigation, the Control Group was actually a coterie of self-interested investors who used their inside positions to exploit

---

[2] For example, MGT used this language in its Annual Reports on Form 10-K for 2013, 2014, and 2015.

public companies for their own financial gain, in violation of the federal securities laws and to the detriment of public investors in those same companies.

36.     The game plan was simple enough: Honig, as the primary strategist, would instruct the other participants to acquire large blocks of a target company's stock at a discount, either by acquiring a shell and executing a reverse merger or by participating in financing terms highly unfavorable to the company that could quickly be turned into shares for the investor.

37.     Upon acquiring enough shares of the target's stock, the team of manipulators exerted their will on company management, acting as an undisclosed control group while simultaneously seeking to give the illusion of liquidity by engaging in a series of arranged wash-trade stock transactions between one another.

38.     Once the target company's securities were properly primed, a stock promotion scheme was commenced whereby paid stock promoters would flood the market with favorable and misleading articles about the target company at the direction of the investment group, generating outside investment in the target company.

39.     As the target company's market capitalization increased due to the purchase of shares by unwitting investors duped by the promotional lies, the schemers took their profits— exiting their positions in the stock and moving on to the next.

1.   **Honig & Co. Orchestrate their Initial Pump-and-Dump of MGT Securities**

40.     Honig and the Control Group's initial exploitation of MGT securities came in October 2012, when Honig, along with Stetson and Groussman purchased MGT convertible preferred shares and 5 year warrants through a $4.5 million private investment in public equity ("PIPE") transaction.  Amongst the terms for this financing imposed by Honig was the requirement

that the financing would only be completed if $300,000 of the investment was used by MGT to promote MGT's common stock.

41.     Stetson, with the knowledge and consent of Honig and Groussman, enlisted known stock promoter John Ford to pen several articles about MGT on the financial website *Seeking Alpha*.  These articles were published in November 2012 and April 2013 and neither disclosed that Ford was being compensated by Honig, MGT, or any other individual for his opinions.

42.     Defendant Ladd, then the CEO of MGT, was aware that Ford was penning articles at the direction of Honig and other members of the Control Group for the purposes of inflating the Company's common stock.  For example, Ladd agreed to be interviewed by Ford for his November 2012 *Seeking Alpha* article, speaking to the author several times before the article's publication.

43.     Further, as payment for his April 2013 pumping article, Stetson sold Ford 30,000 MGT shares and warrants at a discount.  Defendant Ladd and MGT were aware of this stock transfer, stating in a Form S-3 Registration Statement filed with the SEC on November 30, 2012 and signed by Defendant Ladd, that Ford's holdings "[r]epresent[ed] shares purchased from an investor in the October 2012 subscription agreement, which include[d] 15,000 shares of common stock issuable upon the exercise of warrants and 15,000 shares of common stock issuable upon the conversion of 6% Series A Cumulative Preferred Stock."

44.     The April 2013 article, premised on the false statement by Ford that MGT's imminent settlement of a patent enforcement action would bring a substantial recovery for the Company, was successful in inflating MGT's stock price from $3.50 to almost $4.50, paving the way for Honig to unload 250,000 shares into the artificially inflated market for gross proceeds of more than $967,000.

45.     In actuality, no large patent infringement settlement was forthcoming for MGT, as the Company would recover just $100,000 several months after this promotional article was published.

### 2.   Barry Honig and Associates Run Their Playbook on BioZone

46.     In early 2011, Honig set the wheels in motion for a stock manipulation scheme on BioZone Pharmaceuticals, Inc. ("BioZone"), a former Delaware corporation headquartered in Georgia that Honig came to control through a reverse merger.

47.     This reverse merger resulted in the creation of BioZone.

48.     Honig and Brauser were not only the controlling shareholders of BioZone, but exercised control over BioZone's management, including over its Chief Executive Officer Elliot Maza. With Dr. Phillip Frost ("Frost"),[3] Stetson, and Groussman's knowledge and consent, Honig and Brauser installed Maza as CEO of BioZone. During his tenure as CEO of BioZone, Maza operated as Honig and Brauser's puppet and sought their approval for BioZone's business decisions.

49.     Like MGT before it, BioZone's SEC filings failed to identify Honig, Brauser, or any of their affiliates as controlling shareholders of the company.

50.     In September 2013, the restrictions on shares acquired by Honig were removed, deposited into a brokerage account, and ready to be sold. Honig directed his associate, O'Rourke, to reach out to Ford, the same stock promoter who had issued the pump and dump articles regarding MGT. O'Rourke asked that Ford write an article on Seeking Alpha promoting BioZone in

---

[3] Dr. Phillip Frost is the Chief Executive Officer and Chairman of OPKO Health, Inc. ("OPKO") another company implicated by the SEC Action. On December 27, 2018, Frost and OPKO settled with the SEC in exchange for: (1) a $100,000 penalty (to be paid by OPKO); (2) an injunction against Frost from violating federal securities laws; and (3) a $5.5 million penalty to be paid by Frost. Frost is currently banned from trading in penny stocks. *See* https://www.opko.com/news-media/press-releases/detail/348/opko-health-and-opkos-ceo-and-chairman-dr-phillip-frost

exchange for below-market price BioZone shares. O'Rourke instructed Ford to write a favorable article about BioZone emphasizing Frost's involvement as he was a well-known billionaire and successful biotech investor.

51.     Despite Honig and his associates' control over the company through their ownership of voting stock and control over management, BioZone kept the control group's presence under wraps in its public filings, instead pointing to the presence of Honig associate Frost on the company's board as a harbinger on future success.

52.     For their part, Honig and his shadow investor team began trading small amounts of BioZone securities to create the appearance of liquidity in advance of the release of paid-for promotional articles directed by the same individuals.

53.     As a result of the promotional articles' publication on *Seeking Alpha*, daily trading volume in BioZone increased from about 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013, and more than 6 million shares on October 2, 2013. The share price increased from an average in August 2013 of $0.48 to $0.97 on October 17, 2013.

54.     Between September 26, 2013 and December 31, 2013, Honig, Brauser, Frost, Groussman, Stetson, O'Rourke, and a few alter ego entities controlled by these individuals, sold over 15.7 million shares of BioZone and received proceeds of over $9.2 million:

| Company A Pump and Dump Proceeds | | | |
|---|---|---|---|
| Defendants | Trade Dates (2013) | Net Quantity Sold | Proceeds |
| **Honig** | 9/23 – 12/16 | (5,892,689) | $3,416,455.17 |
| **Brauser** and **Grander** | 9/27 – 12/23 | (2,128,316) | $1,137,775.46 |
| **Frost** | 10/1 – 10/4 | (1,987,991) | $1,085,321.74 |
| **Groussman** and Melechdavid | 9/26 – 10/14 | (1,229,166) | $677,272.37 |
| **Stetson** and **SCI** | 9/27 – 12/18 | (500,000) | $279,859.68 |
| **O'Rourke** and **ATG** | 9/23 – 12/27 | (250,000) | $148,443.68 |
| **Alpha Capital** | 10/3 – 11/27 | (3,772,200) | $2,513,724.08 |
| **Total** | | (15,760,362) | $9,258,852.18 |

### 3.  Honig and Associates Manipulate MabVax

55.    Coming off of the success of their BioZone pump-and-dump, Honig and his associates next set their sights on MabVax Therapeutics Holdings, Inc. ("MabVax"), a clinical-stage biotechnology company focused on the development of antibody-based products to address unmet medical needs in the treatment of cancer that was previously a private company known as Telik, Inc. ("Telik").

56.    In early 2014, Honig identified Telik and introduced its CEO to an investment fund that frequently co-invested alongside Honig ("Entity H"), who suggested that Telik go public—a process completed through the reverse merger with the public shell company identified by Honig.

57.    As part of the process for taking Telik public, Honig helped arrange financing, including more than $1 million from HSCI, a corporation co-owned by Honig and Stetson.  The result of this investment was HSCI, along with "Entity H" controlling 67% of the authorized shares of the newly public MabVax.

58.    Now in control of MabVax, Honig went to work inflating its stock price, directing O'Rourke to write a promotional article on financial website *Seeking Alpha* on April 8, 2015 under

the pseudonym "Wall Street Advisors" wherein O'Rourke touted MabVax as an "overlooked opportunity."

59.     Knowing that the promotional article was poised to hit the market, O'Rourke and Groussman engaged in their pre-news trading game to give the appearance of liquidity, driving the price of MabVax's stock up from $3.14 per share to $3.73 per share in the minutes before the promotional articles' publication.

60.     Ultimately, the article was effective, with trading volume increase 7500% between April 2, 2015 to April 6, 2015 and the company's stock price rising from $1.91 per share on April 1, 2015 to $4.30 per share on April 9, 2015.

61.     Several members of the Scheme Group identified herein similarly seized on the success of the MabVax manipulation to take profits, collecting proceeds of more than $5.6 million:

| Company C Pump and Dump Proceeds, Following April 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| Brauser | 4/13 – 6/30 | (576,400) | $1,600,826.76 |
| Groussman and Melechdavid | 4/6 – 6/23 | (99,616) | $342,984.59 |
| Stetson and HSCI | 4/6 – 6/30 | (1,080,379) | $3,607,248.91 |
| O'Rourke and ATG | 4/8 – 6/30 | (30,064) | $69,744.51 |
| Total | | (1,786,459) | $5,620,804.77 |

62.     Honig and his associates again sought to pump up MabVax's stock in July 2015 when, on July 1, 2015, stock promoter John Ford (with whom the Control Group worked to pump MGT and BioZone stocks previously) published a touting article at the direction of O'Rourke that caused MabVax's stock price to shoot upwards from a closing price of $2.32 per share on June 30, 2015 to $2.71 on July 2, 2015, and opening the door for Defendant Ladd and his Scheme Group cohorts to reap sale proceeds of more than $2.7 million:

| Company C Pump and Dump Proceeds, Following June 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| Brauser | 7/1 – 10/7 | (363,050) | $749,025.45 |
| Groussman and Melechdavid | 7/15 – 12/18 | (212,034) | $243,250.96 |
| Stetson and HSCI | 7/1 – 12/7 | (682,539) | $1,525,588.49 |
| O'Rourke and ATG | 7/1 – 12/31 | (179,690) | $235,253.20 |
| Total | | (1,437,313) | $2,753,118.10 |

## C.  Honig and Associates Make a Dilutive Investment in MGT and Take Control

63.     Needing a cash injection, MGT turned to Honig and several of his associates in October 2015, entering into subscription agreements related to the issuance and sale of 2.8 million units (valued at $700,000), at a purchase price of $0.25 per unit:

| | Number of Units Purchased | Total Cost |
|---|---|---|
| Honig | 800,000 | $200,000.00 |
| Brauser | 400,000 | $100,000.00 |
| Groussman | 600,000 | $150,000.00 |
| Stetson | 250,000 | $62,500.00 |
| O'Rourke | 250,000 | $62,500.00 |
| Other Investors | 500,000 | $125,000.00 |
| TOTAL | 2,800,000 | $700,000.00 |

64.     Each unit consisted of one share of the Company's common stock and a three year warrant to purchase two shares of common stock at an initial exercise price of $0.25 per share.

65.     Notably, the Company declined to name who these investors were, stating only in its October 9, 2015 Form 8-K filing and associated press release that the Company had "entered into agreement with several accredited investors" and that "[t]he investment was led by Barry Honig, a private investor and a specialist in corporate finance."

66.     The opacity was purposeful, as Ladd and Honig sought to conceal the parties in the investment to obfuscate the relationship among the investors and allow each to stay below the 5% threshold for mandatory SEC reporting.  To this end, on October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers.  $175,000 x 4 investors will be each at 4.9%," implicitly

acknowledging the 5% ownership reporting requirement.  Honig responded, copying Brauser and Stetson, and indicating that he would provide the participating investor names, which he did on October 5, 2015 and which included GRQ (controlled by Honig), Melechdavid (controlled by Groussman), Grander (controlled by Brauser), ATG (controlled by O'Rourke), and SCI (controlled by Stetson).

67.     The warrant agreements even included a built-in failsafe to ensure that each investor would not eclipse the 4.99% reporting threshold, including a "Beneficial Ownership Limitation" that stated that the Company would not affect any exercise of the warrant to the extent that after giving effect to such issuance, the holder's ownership in the Company would exceed 4.99% of the Company's outstanding stock.  This deal structure allowed the investors to repeatedly convert and sell their shares while appearing individually to stay below the reporting threshold set forth in Section 13(d) of the Exchange Act—providing cover for the Scheme Group's forthcoming pump and dump scheme.

68.     The warrants were exercisable on the earlier of: (i) one year from the date of issue or (ii) the occurrence of certain corporate events, including a private or public financing, subject to approval of Honig, in which the Company receives gross proceeds of at least $7,500,000; a spinoff; one or more acquisitions or sales by the Company of certain assets approved by the stockholders of the Company; or a merger, consolidation, recapitalization, or reorganization approved by the stockholders of the Company (individually, each a "Qualifying Transaction").

69.     Coinciding with the announcement of the subscription agreement with Honig, the Company announced on October 9, 2015 that it had entered into an amended and restated employment agreement with Defendant Ladd as President and CEO of the Company, despite announcing less than two weeks prior on September 28, 2015 that the Company had provided him

with a written notice of intent to not renew his employment agreement and that the agreement would expire in accordance with its terms on November 30, 2015.

70.     This restated agreement provided Ladd with a yearly salary of $199,500 (a 30% pay cut from his previous salary of $285,000 per year) and granted him 200,000 shares of unregistered common stock.

71.     Armed with a substantial stock interest in the Company and a supine CEO with a reduced salary and newfound motivation to increase the Company's stock price, Honig directed the commencement of the scheme.

**D.  The Company Secretly Pays for Stock Promotion at the Direction of Honig and Several Scheme Group Members Dump their Shares**

72.     By January 2016, Honig, Groussman, Brauser, Stetson and O'Rourke had acquired at least 16.3% of MGT's outstanding stock.  On or around January 21, 2016, Honig directed Defendant Ladd to wire $125,000 to a known stock promoter as an upfront payment for a promotional article.

73.     Thereafter, on February 3, 2016, an article was published by stock promoter "Small Cap Leader," touting MGT as a high profit-potential investment and using the Honig-led investment to tout the Company to unsuspecting retail investors (the "February 2016 Promotional Article"):

> **MGT Capital Investments, Inc.** (**MGT**) is our new alert on the *NYSE MKT* and we believe there is strong potential for upside from current levels. **MGT** is focused on building value with gaming technology through acquisition, development, and monetization.
>
> **MGT** is priced lower and has a smaller market cap than most of our alerts, but we believe upside potential is present which is our main goal.

17

**MGT Capital Investments** (**MGT**) and its subsidiaries own and operate social and real money gaming sites online and in the mobile space, including MGTplay.com and SlotChamp™.

**MGT** also owns intellectual property relating to slot machines and has asserted its claims via patent infringement lawsuits. In addition, **MGT** has ownership stakes in DraftDay.com, a top daily fantasy sports wagering platform and Viggle Inc., operator of an online entertainment marketing and rewards platform with 10 million registered users.

**MGT** is positioned to become a leading player in Internet and mobile gaming and is led by an experienced management team with interests aligned with stockholders. According to Digi-Capital™, **mobile games revenue will grow from $29 billion in 2015 to $45 billion by 2018 at 15% annual growth**.

In October, **MGT** announced that they entered into agreements with several accredited investors providing $700,000 of equity capital. The investment was led by Barry Honig, a private investor and a specialist in corporate finance. Mr. Honig was a former founder and Co-Chairman of interClick, which was acquired by Yahoo in 2011 for **$280 million**.

In September, **MGT** announced the sale of its daily fantasy sports assets and received approximately $5.5 million of cash and securities in total consideration. The assets went to a new entity called DraftDay (offers daily fantasy sports) and **MGT** retains 10% ownership. DraftDay has paid out over $30 million in prizes with player retention and brand loyalty second to none in the industry.

"*With MGT's further enhanced balance sheet and reduced cost structure, I believe the time is perfect to consider all methods to create value for shareholders,*" stated Robert Ladd, the Company's Chief Executive Officer.

**MGT** has a market cap of approximately 6M and has zero debt. **MGT** also has a low float right around 12M.

In November, **MGT** reported financial results and operational developments for the fiscal third quarter ended September 30th, 2015. Below are highlights of the developments.

As mentioned, **MGT** Sports closed the sale of its daily fantasy sports assets and received over **$5.0 million** of cash and securities in total consideration.

**MGT** entered into agreements with several accredited investors (led by Barry Honig, a private investor and specialist in corporate finance), providing $700,000 of equity capital.

**MGT** currently has 17.2 million common shares outstanding and carries zero debt. Pro–forma for the recent equity offering, the Company has a stated book value of **$7.7 million**.

The Company expects its cash loss to be materially lower for 2016, due to the sale of DraftDay combined with further corporate cost reductions.

**With MGT's further enhanced balance sheet and reduced cost structure, the board is considering all methods to create value for shareholders, including potential mergers, spin–offs, distributions and other strategic actions**.

**MGT** has closed green for 2 consecutive days while the markets have been down. **MGT** also has experienced a few rallies already in 2016 including a **56%** intraday rally on January 8th where it ended up closing up **39%** on the day.

74.     The February Promotional Article provided liquidity to the otherwise thin market for MGT stock, as there was a 7000% increase from the previous day's trading volume, and an intraday price increase of over 60%.  Honig, Stetson, and O'Rourke, as well as Defendant Ladd each seized on this opportunity to unload some of their holdings into the inflated market, collectively taking proceeds of nearly $200,000, with Honig recouping 62% of his total investment in the Company through these related stock sales, Stetson and O'Rourke recouping 33% and 26% respectively, and with Defendant Ladd recouping almost half of the $85,500 pay cut he took in his new employment contract:

| Company B Pump and Dump Proceeds, Following February 2016 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2016)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** and **GRQ** | 2/3 – 4/6 | (231,050) | $123,154.87 |
| **Stetson** | 2/3 – 2/11 | (40,000) | $20,483.33 |
| **O'Rourke** and **ATG** | 2/3 – 2/9 | (64,366) | $15,960.72 |
| **Ladd** | 2/3 – 5/3 | (96,072) | $39,204.12 |
| **Total** | | **(431,488)** | **$198,803.04** |

**E.  The Scheme Group Seeks Out an Acquisition to Bolster MGT**

75.     On March 29, 2016, O'Rourke sent John McAfee, the creator of a popular antivirus software and a well-known figure in the cybersecurity industry, a term sheet for the asset purchase

of McAfee's startup company Future Tense Secure Systems, Inc. (previously known as Future Tense Central) ("Future Tense") by an "NYSE listed company."  After McAfee indicated interest in discussing a deal on April 3, 2016, O'Rourke reached out to Honig to inquire whether he was still interested in pursuing a McAfee deal, to which Honig responded in the affirmative.

76.     In April 2016, O'Rourke introduced Defendant Ladd to John McAfee, with O'Rourke, Ladd, McAfee, and other MGT and McAfee advisors meeting at the New York office of MGT's corporate counsel, where the parties agreed that MGT would be rebranded as a cybersecurity company led by McAfee.

77.     MGT's purported pivot into the cybersecurity space would rely on two McAfee-related assets: D-Vasive Inc. ("D-Vasive") and Demonsaw LLC ("Demonsaw").

78.     D-Vasive was a Wyoming corporation created for the purposes of transferring the D-Vasive anti-spyware technology being developed at Future Tense to MGT.

79.     The problem was that MGT had very little cash. According to MGT's Quarterly Report on Form 10-Q for the first quarter of 2016, as of March 31, 2016, it had only $189,000. And its cash situation was not improving: according to MGT's Quarterly Report on Form 10-Q for the second quarter of 2016, MGT ultimately had zero revenue in the first six months of 2016, and a net loss of $7.4 million.

80.     To finance the deal, on May 5, 2016, D-Vasive "issued to accredited investors a total of $100,000 principal amount of six–month 6% Convertible Notes" that could be "converted into 8,800,000 shares of D–Vasive common stock"[4] (the "D-Vasive Notes"). According to O'Rourke/ATG's allegations in their lawsuit against MGT and others,[5] the D-Vasive Notes were

---

[4] MGT Capital Investments, Inc., Definitive Proxy Statement (Schedule 14A) (Aug. 15, 2016), Annex F at F-13.
[5] Honig, Stetson, O'Rourke, and Groussman brought an action against MGT, McAfee, Ladd, and other members of the MGT Board styled as *ATG Capital LLC et al. v. MGT Capital Investments, Inc. et al.*, C.A. No. 1-17-cv-2440 (S.D.N.Y) (filed April 4, 2017), claiming that MGT refused to close the deals with D-Vasive and Demonsaw because

issued to the same investors who had provided MGT with $700,000 of equity capital in October

2015, and they provided "a bridge loan of $100,000 for D-Vasive to support management salaries,

fees, and costs of operations while MGT obtained shareholder approval."

81.     MGT announced the D-Vasive deal publicly in a pre-market May 9, 2016 press

release and 8-K, stating in relevant part:

> John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire
> Security/Privacy Technology
>
> *Mr. McAfee to be Chairman and CEO of renamed John McAfee*
> *Global Technologies*
>
> MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today that it has
> entered into a definitive asset purchase agreement to acquire certain technology and
> assets from D-Vasive Inc., a provider of leading edge anti-spy software. D-Vasive
> offers a powerful tool for protection from the proliferation of invasive apps by
> consumer products companies, social networks, financial institutions and others.
> These invasive apps can secretly turn on a phone's microphone and camera, as well
> as monitor geographic movements and access contacts. The D-Vasive technology
> operates in a unique way, allowing the user to manage and control the device's
> internal hardware. D-Vasive will be available shortly for Android and Windows
> platforms, followed by a release for Apple iOS.
>
> In conjunction with the acquisition, MGT is pleased to announce the proposed
> appointment of John McAfee as Executive Chairman and Chief Executive Officer.
> **Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus**
> **company to Intel for $7.6 billion, and is actively involved in the development**
> **of new measures to protect individual freedoms and privacy.** Mr. McAfee
> stated, "The enormous impact of cybersecurity on our lives requires the scale and
> resources of a public company. Our ability to continue to hire the best minds in the
> business will be vastly enhanced with a public platform. With the acquisition of D-
> Vasive technology as a starting point, we expect to grow MGT into a successful
> and major force in the space." MGT Capital also intends to change its corporate
> name to John McAfee Global Technologies, Inc.

---

the value of the shares owed to these financial backers had risen in excess of $40 million – an amount purportedly
viewed as unfairly benefitting these individuals – and thus deprived these plaintiffs of the true value of their bridge
loan investments in D-Vasive and Demonsaw. Am. Complaint ¶ 20, *ATG Capital LLC et. al. v. MGT Capital*
*Investments, Inc.,* No. 17-cv- 2240-AJN (S.D.N.Y. Jun. 26, 2017), ECF No. 54.

**F.  The Scheme Group Uses the McAfee News to Double Dip on their Pump-and-Dump**

82.    Knowing that the Company's misleading[6] announcement of the McAfee deal, as approved by Defendant Ladd, would be released during the morning of May 9, 2016, Honig, in pre-market trading that same day, bought and sold small quantities of MGT common stock dozens of times to create the appearance of market liquidity and spur outside investment upon the publication of the McAfee news.  Brauser and Groussman joined Honig in this pre-market manipulation, engaging in coordinated trades of MGT stock in what had become a hallmark of these individuals' pumping scheme.

83.    For its part, MGT (under the control of Defendant Ladd) paid an additional $125,000 to StockBeasts, a well-known stock promotion firm, to amplify its news and spur outside investment, which came in the form of a May 9, 2016 promotional article (the "May 2016 Promotional Article," and together with the February Promotional Article, the "Promotional Articles") which stated:

> Guess who's back????
>
> When I was young, I used to watch Jeopardy and I would try to guess at the answers. I was pretty good at it. Well if I am ever watching and see this answer come up – "This man is the most universally known name in Cybersecurity, sold his startup company to Intel for $7.6BB, is frequently on CNBC, Fox News, Bloomberg, Wall St Journal, and recently became the CEO of a $9MM company and renamed it after himself," I will hit the buzzer, wager all of my money and say "Alex, Who is John McAfee"?
>
> Folks, it's rare that we get an opportunity like this to get involved in a potential behemoth with amazing implications in our day to day life, as well as our portfolio. Imagine investing in Computing, Or Internet at its infancy. Imagine the returns. Well those returns have been generated by traders, investors, and funds who invested in John McAfee in the beginning, and here is your opportunity to follow his lead.
>
> *Are you worried about cybersecurity? Well you should be.*

---

[6] *See* paragraphs 127-129, *infra.*

Are you concerned about an organization using your own computer or cell phone - to spy on you? Well you should be.

Are you the least bit afraid that your private pictures will somehow end up on the web because that app you just downloaded granted access to your gallery? Well you should be.

Notice the trend. I will keep this simple. Every app, software, and computer program has the capacity to send your information out. How do you think Facebook makes money?

Google? Have you ever read the thousand page(s) of Terms and Conditions? I haven't yet. Maybe I should!

Now we don't have to worry. Internet Privacy is a huge dilemma. And now that dilemma is also a HUGE opportunity for us to capitalize. The IT security space is big enough to allow for new entrants. When it comes to Device Security, investors can now take look at what internet security and information privacy pioneer John McAfee's Future Tense Secure Systems has developed with its D-Vasive.

How do you think the company is going to react as these new products are released and the company grows? MGT is currently sitting at around $0.50 and will have pro forma fully diluted 50 MM Outstanding shares. **This is simple math. John McAfee sold his last company for $7.6BB. This is big!**

*Stop Being Spied On!*

Everyday more and more invasive apps are being released. These invasive apps want to silently turn on your microphone to record your voice as well as turn on your camera to video record your activities.

D-Vasive operates in a unique way, allowing you complete control in managing your internal hardware. So that way, when a potential malicious application tries to open your Camera, Mic, Bluetooth or WiFi and spy on you, D-Vasive lets you know, and lets you completely lock them down.

For those savvy investors who like to dig further, the entire 8K is here for your perusal: http://yahoo.brand.edgar-online.com/displayfilinginfo.aspx?filingid 369637&tabindex=2&type=html

I wouldn't be surprised if we see a full media blitz with interviews and media dedicated to this story. Could this be just the beginning of a MGT rally?

84.     Over the next few days, MGT's stock price skyrocketed on unprecedented trading volume. On May 6, 2016, MGT stock had closed at $0.36 with trading volume of just 71,000 shares. Over the next few days, MGT's daily closing prices reached new heights:

    a.  Closing price of $0.48 on May 9, 2016—a 33% increase over the previous day on more than 10 million shares traded;

    b.  Closing price of $0.73 on May 10, 2016—a 52% increase over the previous day;

    c.  Closing price of $1.28 on May 11, 2016—a 75% increase over the previous day;

    d.  Closing price of $1.51 on May 12, 2016—an 18% increase over the previous day;

    e.  Closing price of $1.72 on May 13, 2016—an 14% increase over the previous day;

    f.  Closing price of $2.96 on May 16, 2016—a 72% increase over the previous day;

    g.  Closing price of $4.15 on May 17, 2016—a 40% increase over the previous day on more than 109 million shares traded.

85.     In the words of a May 18, 2016 *Bloomberg* article, MGT was "an obscure penny stock that has surged sevenfold in two weeks…. Volume has jumped sixfold and the market value surged to about $80 million from $6 million—for a company that has reported losses every year since at least 2001."[7]

---

[7] Joseph Ciolli, *McAfee Microcap's Down Day Does Little to Dent 2-Week Frenzy*, Bloomberg, May 18 2016 3:29 pm, https://www.bloombergquint.com/markets/2016/05/18/mcafee-microcap-s-down-day-does-little-to-dent-two-week-frenzy

86.     Yet what outside investors did not know was that, at the same time the Company was touting its future prospects given the pivot to cybersecurity and alliance with John McAfee, the Scheme Group was taking **more than nine million dollars in profit** through unreported stock sales, driven by the Control Group's undisclosed and early conversion of millions of warrants into shares and Defendant Ladd's dumping of hundreds of thousands of shares:

| Company B Pump and Dump Proceeds, Following May 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| **Honig** and **GRQ** | 5/9 – 5/20 | (3,783,001) | $2,393,915.52 |
| **Brauser** and **Grander** | 5/9 – 5/18 | (2,137,668) | $3,839,295.64 |
| **Groussman** and Melechdavid | 5/9 – 5/11 | (1,415,870) | $999,873.56 |
| **Stetson** and **SCI** | 5/9 – 5/12 | (750,000) | $660,798.20 |
| **O'Rourke** and **ATG** | 5/9 – 5/16 | (750,000) | $990,661.97 |
| Ladd | 5/9 – 5/31 | (471,000) | $516,554.08 |
| **Total** | | **(9,307,539)** | **$9,401,098.97** |

## G.  The Attempted Demonsaw Acquisition

87.     On May 12, 2016, MGT announced it had paid $150,000 to acquire an interest in Round House LLC, an Alabama-based technology incubator. Round House's managing member was Kyle Sandler, who owned an interest in Demonsaw and who had previously worked on John McAfee's presidential campaign and ran Future Tense's day-to-day operations.

88.     On May 26, 2016, pre-market, MGT announced the Demonsaw acquisition in a press release and Form 8-K, stating in relevant part:

> MGT Capital Agrees to Acquire Secure File Sharing Technology
>
> Eric Anderson to be appointed as Chief Technology Officer of to-be- renamed John McAfee Global Technologies
>
> MGT Capital Investments, Inc . (NYSE MKT: MGT) announced today that it has entered into a definitive asset purchase agreement to acquire certain technology and assets from Demonsaw LLC, a provider of a secure and anonymous file sharing software platform. Using  multiple  layers  of  encryption  (both  symmetric  and

asymmetric), Demonsaw offers users full control of data and also offers private router services.

Demonsaw is a fully decentralized, mesh-based network that does not use P2P, providing protection of IP addresses….

In conjunction with the anticipated acquisition, MGT is pleased to announce the proposed appointment of Eric J. Anderson as Chief Technology Officer upon closing of the transaction. Mr. Anderson, who is well known as "Eijah" in the hacker community, is the founder of Demonsaw. For the past five years he was an Associate Technical Director and Lead Programmer for Rockstar Games where he architected core engine and artificial intelligence code for Grand Theft Auto, among the world's highest grossing video game franchises…. He is an active member of the hacking community and is an avid proponent of Internet freedom. Closing of the acquisition is contingent on customary conditions including approval by MGT's stockholders. Major terms of the deal include the payment to Demonsaw LLC members of 20.0 million restricted shares of MGT common stock. The proposed share issuance is expected to amount to approximately 28% of the Company's common stock on a pro-forma fully diluted basis at closing, inclusive of shares of common stock to be issued in connection with the Company's previously announced transaction with D-Vasive, Inc.

*** 

Mr. McAfee, concluded with this comment, "I want to reiterate my personal commitment towards the creation of a major force in cybersecurity. As a listed company with proper corporate governance and regulatory standards, MGT will be the vehicle I use to create wealth for all stockholders."

89.     Under the terms of the deal, Demonsaw's owners would receive 20 million restricted shares of MGT common stock. This required MGT to issue new shares that were "expected to amount to approximately 28% of the Company's common stock on a pro-forma fully diluted basis at closing, inclusive of shares of common stock to be issued in connection with the Company's previously announced transaction with D-Vasive, Inc."

90.     The Demonsaw Transaction was financed in part through "certain convertible debt securities issued by Demonsaw on or about May 25, 2016."[8] According to the pleadings of O'Rourke/ATG in their lawsuit against MGT, these securities consisted of a "bridge loan…of

---

[8] *See* MGT Capital Investments, Inc., Current Report (Form 8-K) (Mar. 3, 2017), Ex. 10.1, at 8.

$750,000 in the form of eight convertible promissory notes" that were "convertible into 10 million shares of Demonsaw" and subject to "mandatory conversion…into equity upon Demonsaw's acquisition by MGT."[9]

91.     On news of the Demonsaw Transaction, MGT's share price climbed $0.07, or 3.12%, to close at $2.31 on May 26, 2016.

92.     On July 7, 2016, and prior to the closing of either of the D-Vasive or Demonsaw acquisition, the Company and Demonsaw terminated the Demonsaw asset purchase agreement. Simultaneously, D–Vasive entered an agreement with the holders of Demonsaw's outstanding ownership interests, whereby D–Vasive would purchase all such ownership interests. The closing of that transaction was contingent on the closing of the transaction contemplated under the D–Vasive asset purchase agreement. Accordingly, the proposed purchase price for D–Vasive (inclusive of the Demonsaw assets) was increased to 43.8 million shares of MGT common stock.

93.     However, the renegotiated transaction never came to fruition, as the deal contemplated as a closing condition approval by the NYSE MKT for the shares used for the acquisition—an impossibility once MGT's stock was delisted.

94.     After nearly a year, in March 2017 MGT announced that it had completed a revised asset purchase agreement through which it acquired a 46% equity interest in Demonsaw for 2 million shares of MGT common stock.

95.     In April 2017, the Company terminated the asset purchase agreement with D-Vasive.

---

[9] Am. Complaint ¶¶ 26–27, *ATG Capital LLC et. al. v. MGT Capital Investments, Inc.*, No. 17-cv-2240-AJN (S.D.N.Y. Jun. 26, 2017), ECF No. 54

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

96.     Throughout the Class Period, the Defendant Ladd, working with the other members of the Scheme Group, sought to conceal the true nature of the group's arrangement to act in concert with respect to MGT's common stock and manipulate the market, all the while causing the Company to issue materially false and misleading statements.

### A.  Relevant SEC Filings

97.     Plaintiffs allege that MGT and Defendant Ladd made materially false and misleading statements in violation of the Exchange Act.

98.     On October 9, 2015, the Company filed with the SEC a current report on Form 8-K announcing MGT's entry into the subscription agreements with the Honig-led investment syndicate (the "October 2015 8-K").  The October 2015 8-K was signed by Defendant Ladd as President and Chief Executive Officer of the Company.

99.     On November 6, 2015, MGT filed with the SEC a registration statement on Form S-1 (the "November 2015 S-1").  The November 2015 S-1 was signed by Defendant Ladd as President and Chief Executive Officer of the Company.

100.    On November 9, 2015, MGT filed with the SEC a preliminary proxy statement on Schedule 14A (the "November 9, 2015 Proxy").

101.    On November 18, 2015, MGT filed with the SEC a preliminary proxy statement on Schedule 14A (the "November 18, 2015 Proxy").

102.    On November 19, 2015, MGT filed with the SEC a definitive proxy statement on Schedule 14A (the "November 19, 2015 Proxy").

103.    On December 17, 2015, MGT filed with the SEC an amended registration statement on Form S-1 (the "December 2015 Registration Statement").   The December Registration

Statement was signed by Defendant Ladd as President, Chief Executive Officer, Interim Treasurer, Interim Chief Financial Officer, and director of MGT.

104.    On January 13, 2016, MGT filed with the SEC an amended registration statement on Form S-1 (the "January 2016 Registration Statement").  The January Registration Statement was signed by Defendant Ladd as President, Chief Executive Officer, Interim Treasurer, Interim Chief Financial Officer, and director of MGT.

105.    On April 14, 2016, MGT filed with the SEC an annual report on Form 10-K (the "April 2016 Annual Report").  The April 2016 Annual Report was signed by Defendant Ladd as President and Chief Executive Officer of the Company.

106.    On May 9, 2016, the filed a current report on Form 8-K (the "May 2016 8-K") announcing its entry into the asset purchase agreement with D-Vasive and agreement with John McAfee for Mr. McAfee to join MGT as Executive Chairman of the Board and CEO of the Company.  The May 2016 8-K was signed by Defendant Ladd as President and Chief Executive Officer of the Company.  Attached to the May 2016 8-K was the related press release issued by the Company on May 9, 2016 (the "May 9, 2016 Press Release").

107.    On May 23, 2016, MGT filed with the SEC a quarterly report on Form 10-Q (the "May 2016 10-Q").  The May 2016 10-Q was signed by Defendant Ladd as President and Chief Executive Officer of the Company.

108.    On July 11, 2016, MGT filed with the SEC a preliminary proxy statement on Schedule 14A (the "July 11, 2016 Proxy").

109.    On September 20, 2016, MGT filed with the SEC a current report on Form 8-K (the "September 2016 8-K").  The September 2016 8-K was signed by Defendant Ladd as President of the Company.  Attached as exhibit 99.1 to the September 2016 8-K was a press release, dated

September 19, 2016, issued by the Company and titled "MGT Receives Subpoena From Securities and Exchange Commission. No Indication That the Company is the Subject of Any Enforcement Proceedings" (the "September 19, 2016 Press Release").

110.    On April 20, 2017, MGT filed with the SEC an annual report on Form 10-K (the "April 2017 Annual Report").  The April 2017 Annual Report was signed by Defendant Ladd as President, Principal Executive Officer, and Principal Financial Officer of the Company.

111.    On May 18, 2017, MGT filed with the SEC a quarterly report on Form 10-Q (the "May 2017 10-Q").  The May 2017 10-Q was signed by Defendant Ladd as President and Interim Chief Financial Officer.

112.    On August 9, 2017, MGT filed with the SEC a quarterly report on Form 10-Q (the "August 2017 10-Q").  The August 2017 10-Q was signed by Defendant Ladd as President and Interim Chief Financial Officer.

113.    On November 9, 2017, MGT filed with the SEC a quarterly report on Form 10-Q (the "November 2017 10-Q").  The November 2017 10-Q was signed by Defendant Ladd as President and Chief Executive Officer.

114.    On April 2, 2018, MGT filed with the SEC an annual report on Form 10-K (the "April 2018 Annual Report").  The April 2018 Annual Report was signed by Defendant Ladd as President and Principal Executive Officer of the Company.

**B.  The Company's Materially False and Misleading Statements and Omissions About the Control Group's Ownership Interest**

115.    Throughout the Class Period, the Company and Defendant Ladd, through MGT's SEC filings, made numerous false and misleading statements and omissions.

116.    First and foremost, ***each and every one of the Company's SEC filings during the Class Period*** omitted and concealed the existence of the Control Group and their control over the operations of MGT, including its role in orchestrating and controlling the Company's funding of the Promotional Articles and the McAfee-related mergers and acquisitions.

117.    This omission artificially inflated MGT's common stock price and was material to shareholders who would not have purchased MGT common stock, or would not have purchased stock in the same price or amounts, had the true extent of MGT as a captured company been disclosed.

118.    To this end, ***each and every statement*** regarding the Company's 5%-or-more beneficial owners found in the SEC filings was materially false and misleading at that time it was made.  These statements were found in the following SEC filings and stated:

(a) The November 2015 S-1:

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| **5% beneficial owners:** | | |
| Iroquois Capital Management, LLC (1)(2) | 1,339,096 | 8% |
| Barry Honig (3) | 1,133,611 | 7% |
| **Total 5% beneficial owners:** | **2,472,707** | 14% |

(b) The November 18, 2015 Proxy:

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| **5% beneficial owners:** | | |
| Iroquois Capital Management, LLC (1)(2) | 1,339,096 | 8% |
| Barry Honig (3) | 1,133,611 | 7% |
| **Total 5% beneficial owners:** | **2,472,707** | 14% |

(c) The November 19, 2015 Proxy:

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| **5% beneficial owners:** | | |
| Iroquois Capital Management, LLC (1)(2) | 1,339,096 | 8% |
| Barry Honig (3) | 1,133,611 | 7% |
| **Total 5% beneficial owners:** | **2,472,707** | 14% |

(d)  The December 2015 Registration Statement:

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| **5% beneficial owners:** | | |
| Iroquois Capital Management, LLC (1)(2) | 1,339,096 | 8% |
| Barry Honig (3) | 1,133,611 | 7% |
| **Total 5% beneficial owners:** | **2,472,707** | 14% |

(e)  The January 2016 Registration Statement:

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| 5% beneficial owners: | | |
| Iroquois Capital Management, LLC (1)(2) | 1,771,923 | 9.9% |
| Barry Honig (3) | 1,731,934 | 9.7% |
| Robert Ladd (4) | 896,074 | 5.0% |

(f)  The April 2016 Annual Report:

| | Numbers of shares beneficially owned | Percentage of Common equity beneficially owned |
|---|---|---|
| **5% beneficial owners** | | |
| Iroquois Capital Management, LLC (1)(2) | 1,787,204 | 9.9% |
| Barry Honig (3) | 1,557,823 | 8.6% |
| Robert Ladd (4) | 896,074 | 5.0% |

(g)  The July 11, 2016 Proxy:

| Name of Beneficial Owner (1) | Numbers of shares of Common Stock beneficially owned | Percentage of Common Stock beneficially owned |
|---|---|---|
| Robert B. Ladd (2) | 2,540,000 | 5.0% |
| H. Robert Holmes | 88,819 | * |
| Michael Onghai | 336,000 | * |
| John McAfee (3) | 6,000,000 | |
| Nolan Bushnell | 150,000 | |
| Officers and directors as a group (4 persons): | | |
| Iroquois Capital Management L.L.C. (4)(5) | 1,740,496 | |
| Barry Honig (6) | | |
| Michael Brauser (7) | 1,149,813 | |

119.     Each of the representations identified in the preceding paragraph were materially false and misleading when made because each concealed and omitted reference to: (i) the existence of Control Group, which itself controlled substantially more than 5% of the Company's outstanding common stock at any given point; or (ii) the fact that Honig led the Control Group, giving him individually a greater interest than the percentage identified in the Company's SEC filings and allowing him to wield undisclosed control over the Company without the investing public's knowledge.

120.     Additionally, the Company actively concealed the identities of the members of the Control Group in its public statements, stating only in the October 2015 8-K:

> On October 8, 2015, MGT Capital Investments, Inc. (the "Company") entered into separate subscription agreements (the "Subscription Agreement") **with accredited investors (the "Investors") relating to the issuance and sale of $700,000 of units (the "Units") at a purchase price of $0.25 per Unit**, with each Unit consisting of one share (the "Shares") of the Company's common stock, par value $0.001 per share (the "Common Stock") and a three year warrant (the "Warrants") to purchase two shares of Common Stock at an initial exercise price of $0.25 per share (such sale and issuance, the "Private Placement").

121.   Further, in the press release attached to the October 2015 8-K as Exhibit 99.1, the Company referred to Honig as having "led" the investment, without any mention of the identities of any other investors in the placement (later determined to be the remaining members of the Control Group), nor that the "several accredited investors" were acting in concert as a control group:

> MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today it has **entered into agreements with several accredited investors providing $700,000 of equity capital**. The capital raise is comprised of the sale of 2.8 million Units, with each Unit consisting of one share of the Company's common stock, and a three-year warrant to purchase two shares of common stock.
>
> * * *
>
> **The investment was led by Barry Honig, a private investor and a specialist in corporate finance.** Mr. Honig is currently Co-Chairman and Chief Executive Officer of Majesco Entertainment Company (COOL), and was a former founder and Co-Chairman of interClick, which was acquired by Yahoo in 2011 for $280 million. He was also the former Co-Chairman of ChromaDex Corporation (CDXC), and is a current Director and the largest investor in Pershing Gold Corporation (PGLC).

122.   The statements identified in paragraphs 120-21 were materially false, misleading, misrepresentative, and/or otherwise omissive in that they failed to disclose that the October 2015 investment was being carried out in large part by the Control Group, which was acting in concert to direct a fraudulent pump and dump scheme to the detriment of Plaintiffs and the other public stockholders of the Company.  Further, by failing to disclose the identities of the individuals investing in the Company, MGT withheld from the investing public material information that would have otherwise informed shareholders of the Control Group's track record for exploiting companies through pump and dump schemes.

123.   Further, in the only instance where the Company's SEC filings did disclose the interest of the non-Honig members of the Control Group, it did so individually, omitting any reference to the group's existence or cohesion and giving the illusion of independence among its

members.  In the November 2015 S-1, the Company identified various members of the Control

Group (who were then seeking to unload portions of their holdings previously acquired through

the November 2015 subscription agreements and warrant exercise), without any mention that these

individuals and entities were part of the larger Control Group operating behind the scenes at MGT

and which would continue to have substantial holdings in the Company after any stock sales

because of the unchecked warrant exercises designed to avoid detection:

| Name of Selling Stockholder | Common Stock Beneficially Owned Prior to the Offering (1) | Common Stock Covered by this Prospectus | Common Stock Owned Upon Completion of this Offering (1)(2) | Percentage of Common Stock Owned Upon Completion of this Offering (1)(3) |
|---|---|---|---|---|
| Grander Holdings, Inc. 401K (4) | 400,000 (5) | 1,200,000 (6) | * | *% |
| LFR Trust LLC (7) | 200,000 (8) | 600,000 (9) | * | *% |
| Iroquois Master Fund Ltd. (10) | 1,339,096 (11) | 900,000 (12) | 1,039,096 (11) | 6% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig (13) | 1,133,611 (14) | 2,400,000 (15) | 333,611 (16) | 1.9% |
| Melechdavid, Inc. (17) | 600,000 (18) | 1,800,000 (19) | * | *% |
| Stetson Capital Investments (20) | 250,000 (21) | 750,000 (22) | * | *% |
| ATG Capital LLC (23) | 250,000 (24) | 750,000 (25) | * | *% |

* represents less than 1%.
   (1) Under applicable SEC rules, a person is deemed to beneficially own securities which the
       person as the right to acquire within 60 days through the exercise of any option or warrant
       or through the conversion of a convertible security. Also under applicable SEC rules, a
       person is deemed to be the "beneficial owner" of a security with regard to which the person
       directly or indirectly, has or shares (a) voting power, which includes the power to vote or
       direct the voting of the security, or (b) investment power, which includes the power to
       dispose, or direct the disposition, of the security, in each case, irrespective of the person's
       economic interest in the security. Each listed selling stockholder has the sole investment
       and voting power with respect to all shares of common stock shown as beneficially owned
       by such selling stockholder, except as otherwise indicated in the footnotes to the table.
   (2) Represents the amount of shares that will be held by the selling stockholders after
       completion of this offering based on the assumptions that (a) the Warrant Exercise Cap has

been removed, (b) all shares registered for sale by the registration statement of which this prospectus is part will be sold and (c) that no other shares of our common stock beneficially owned by the selling stockholders are acquired or are sold prior to completion of this offering by the selling stockholders.

(3) In determining the percent of common stock beneficially owned by a selling stockholder following the offering, (a) the numerator is the number of shares of common stock beneficially owned by such selling stockholder (including shares that he has the right to acquire within 60 days of November 4, 2015), and (b) the denominator is the sum of (i) the 17,199,655 shares outstanding after offering based upon 17,199,655 shares of common stock outstanding on November 4, 2015 and (ii) the number of shares of common stock which such selling stockholders has the right to acquire within 60 days of November 4, 2015 after offering.

(4) Michael Brauser is the trustee of Grander Holdings, Inc. 401K and holds voting and dispositive power over shares held by Grander Holdings, Inc. 401K.

(5) Excludes 800,000 shares of common stock issuable upon exercise of warrants that are subject to the Warrant Exercise Cap.

(6) Includes 800,000 shares of common stock issuable upon exercise of warrants that are subject to the Warrant Exercise Cap.

(7) KC Langston is the trustee of LFR Trust LLC and holds voting and dispositive power over shares held by LFR Trust LLC.

(8) Excludes 400,000 shares of common stock issuable upon exercise of warrants that are subject to the Warrant Exercise Cap.

(9) Includes 400,000 shares of common stock issuable upon exercise of warrants that are subject to the Warrant Exercise Cap.

(10) Iroquois Capital Management LLC ("Iroquois Capital") is the investment manager of Iroquois Master Fund Ltd. ("IMF"). Consequently, Iroquois Capital has voting control and investment discretion over securities held by IMF. As managing members of Iroquois Capital, Joshua Silverman and Richard Abbe make voting and investment decisions on behalf of Iroquois Capital in its capacity as investment manager to IMF. As a result of the foregoing, Mr. Silverman and Mr. Abbe may be deemed to have beneficial ownership (as determined under Section 13(d) of the Securities Exchange of 1934, as amended) of these securities held by IMF .

(11) As reported on Amendment Number 4 to the Schedule 13D filed by, among others, Iroquois, Iroquois Master Fund Ltd. and Joshua Silverman with the SEC on October 2, 2014, Iroquois directly owns 48,378 shares of Common Stock and Iroquois Master Fund Ltd. directly owns 990,358 shares of Common Stock. Iroquois is the investment advisor to Iroquois Master Fund Ltd., such that Iroquois may be deemed the beneficial owner of the 990,358 shares of Common Stock owned by Iroquois Master Fund Ltd. Excluded from Iroquois Master Fund, Ltd.'s beneficial ownership is 9,221 shares of Common Stock issuable upon conversion of shares of Series A Convertible Preferred Stock held by Iroquois Master Fund, Ltd. and 437,500 shares of Common Stock issuable upon the exercise of warrants, both of which are subject to a conversion cap that precludes Iroquois Master Fund, Ltd. from converting or exercising the Series A Convertible Preferred Stock and warrants, respectively, to the extent that Iroquois Master Fund, Ltd. would, after such conversion or exercise, beneficially own (as determined in accordance with Section 13(d) of the Exchange Act) in excess of the Conversion Cap.  Because Iroquois Master Fund,

36

Ltd. has exceeded the Conversion Cap, it cannot convert or exercise its rights under the Series A Convertible Preferred Stock or warrants, respectively, within 60 days hereof and thus is not deemed to beneficially own those shares of Common Stock underlying the Preferred Stock and warrants. Also excluded are 600,000 shares of common stock underlying warrants that are (i) subject to the Warrant Exercise Cap and (ii) are not exercisable to the extent an exercise by the holder would result in the holder's beneficial ownership of the Company exceeding 4.99% of the issued and outstanding common stock. The holder's ownership has been so limited.

(12) Includes 600,000 shares of common stock issuable upon exercise of warrants that are subject to the Warrant Exercise Cap.

(13) Barry Honig is the trustee of GRQ Consultants, Inc. Roth 401K FBO Barry Honig and holds voting and dispositive power over shares held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig.

(14) As reported on the Schedule 13G filed by Barry Honig, GRQ Consultants, Inc. 401K, for which Mr. Honig is Trustee and over which he holds voting and dispositive power, and GRQ Consultants, Inc. Roth 401K FBO Barry Honig, for which Mr. Honig is Trustee and over which he holds voting and dispositive power, GRQ Consultants, Inc. 401K directly holds 333,611 shares of common stock and GRQ Consultants, Inc. Roth 401K FBO Barry Honig directly holds 800,000 shares of common stock. Excludes 1,600,000 shares of common stock issuable upon exercise of outstanding warrants the held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig. The warrants are (i) subject to the Warrant Exercise Cap and (ii) not exercisable to the extent an exercise by the holder would result in the holder's beneficial ownership of the Company exceeding 4.99% of the issued and outstanding Common Stock. The holder's ownership has been so limited. Mr. Honig's address is 555 South Federal Highway, #450, Boca Raton, FL 33432.

(15) Includes 1,600,000 shares of common stock issuable upon exercise of warrants that are subject to the Warrant Exercise Cap.

(16) Includes 333,611 shares of common stock held by GRQ Consultants, Inc. 401K.

(17) Mark Groussman is the president of Melechdavid Inc. and holds voting and dispositive power over shares held by Melechdavid Inc.

(18) Excludes 1,200,000 shares of common stock issuable upon exercise of warrants that are subject to the Warrant Exercise Cap.

## C. **The Company's False and Materially Misleading Statements About MGT Stock's Volatility**

124.    Throughout the Class Period, the Company purported to warn of the "securities market risks," stating:

*Our stock price and trading volume may be volatile, which could result in losses for our stockholders.*

The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our Common stock

could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our Common stock.  We cannot predict the potential impact of these periods of volatility on the price of our Common stock. The Company cannot assure you that the market price of our Common stock will not fluctuate or decline significantly in the future.

125.    The above statement was made in the November 2015 Registration Statement, the December 2015 Registration Statement, the January 2016 Registration Statement, the April 2016 Annual Report, and the April 2017 Annual Report.

126.    The statements identified in paragraph 124-125 were materially false and/or misleading at the time they were made because they misrepresented and/or failed to disclose the true reason for the Company's stock price volatility—the Scheme Group's intention to drive up MGT's stock price through the use of promotional articles, followed by several dilutive warrant conversions and stock sales that allowed them to flood the market with MGT shares and reap the financial windfall associated therewith.

**D.  The Company's Materially False and Misleading Statements Timed to Bolster the Scheme Group's Stock Sales**

127.    On May 9, 2016, the Company issued a press release announcing that it had entered into a definitive asset purchase agreement to acquire certain technology and assets from D-Vasive. In that press release, the Company stated:

> In conjunction with the acquisition, MGT is pleased to announce the proposed appointment of John McAfee as Executive Chairman and Chief Executive Officer. Mr. McAfee, the visionary pioneer of internet security, **sold his anti-virus company to Intel for $7.6 billion**, and is actively involved in the development of new measures to protect individual freedoms and privacy. Mr. McAfee stated, "The enormous impact of cybersecurity on our lives requires the scale and resources of a public company. Our ability to continue to hire the best minds in the business will be vastly enhanced with a public platform. With the acquisition of D-Vasive technology as a starting point, we expect to grow MGT into a successful and major force in the space." MGT Capital also intends to change its corporate name to John McAfee Global Technologies, Inc.

128.   The Company further sought to capitalize on the magnitude of Intel's purchase in the May 2016 10-Q, where it stated:

> The Company also agreed as part of the closing conditions to enter into certain consulting agreement with Future Tense Secure Systems, Inc. certain employment agreements with key management of D–Vasive and an employment agreement with John McAfee pursuant to which Mr. McAfee will join the Company as Executive Chairman of the Board of Directors and Chief Executive Officer of the Company at the closing of the transaction contemplated in the APA. John David McAfee is the cybersecurity industry's pioneer and the developer of the world's first commercial anti-virus software. **He founded McAfee Associates in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010**. Upon closing of the transaction the Company intends to change its corporate name to John McAfee Global Technologies

129.   The emphasized statements identified in paragraphs 127-28 were materially false and/or misleading when made because John McAfee had left his anti-virus company more than a decade prior to its sale to Intel for $7.6 billion, a fact Defendant Ladd either knew or was reckless in not knowing at the time of the statement's distribution.

130.   Instead, as set forth herein, the statements were made at a time when the Scheme Group, including Defendant Ladd, were taking profits on the back end of their pump-and-dump scheme, and thus served to artificially bolster the stock on the news of the D-Vasive transaction.

**E.   The Company's False and Misleading Statements About the SEC Subpoena and Ladd's Exposure to the Investigation**

131.   On September 19, 2016, the Company issued the September 19, 2016 Press Release, stating:

> HARRISON, N.Y., Sept. 19, 2016 /PRNewswire/ -- MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today that on September 15, 2016, it received a subpoena from the Securities and Exchange Commission requesting certain information from the Company. **MGT has no indication or reason to believe that the Company is or will be the subject of any enforcement proceedings**.

132.    Similarly, the April 2017 Annual Report and May 2017 10-Q stated:

On September 15, 2016, the Company received a subpoena from the U.S. Securities and Exchange Commission. The Company has cooperated fully with the Commission and its Staff. **The Company does not presently believe it or its officers are the focus of the Staff's investigation.**

133.    The Company tempered its language regarding officer liability beginning in August

2017, stating in the August 2017 10-Q and November 2017 10-Q:

On September 15, 2016, the Company received a subpoena from the U.S. Securities and Exchange Commission. The Company has cooperated fully with the Commission and its Staff in a timely manner. The Company intends to fully comply with any additional requests the Company may receive from the SEC in the future.

134.    The statements identified in paragraph 131-33 were materially false, misleading, or

omissive when made because the subpoena received by the Company clearly probed on the issue

of the Company's stock promotion activities and relationships with, among others, the Control

Group, as well as the Company's May 9, 2016 Form 8-K which, as alleged above, was materially

false and misleading and directly connected to the pump and dump scheme orchestrated by the

Scheme Group.  Thus, the Company and Defendant Ladd had no reasonable basis to believe or to

claim that no member of the Company's management would be subject to any enforcement

proceeding when they each had actual knowledge that Defendant Ladd had participated in the

stock scheme alleged herein along with several of the parties identified in the subpoena.

## THE TRUTH IS REVEALED OVER SEVERAL PARTIAL DISCLOSURES

**A.  The Company Announces its Receipt of an SEC Subpoena, the Contents of Which are Reported Upon by a Financial Journalist, and MGT's Stock Gets Delisted from the NYSE**

135.    On September 19, 2016, the Company announced that it had received a subpoena

from the SEC:

MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today that on September 15, 2016, it received a subpoena from the Securities and Exchange Commission requesting certain information from the Company. MGT has no indication or reason to believe that the Company is or will be the subject of any enforcement proceedings. The Company is fully cooperating to comply with the SEC's request.

136.    The subpoena commanded the production of, *inter alia*:[10]

(h)    "Documents sufficient to identify all principals, officers, directors, shareholders and other persons with direct or indirect beneficial ownership interest in, or who have exercised direct or indirect control over, MGT."

(i)    "All Documents Concerning any relationship or Communications between MGT and any individual or entity engaged in the marketing, offering, promotion and/or sales of MGT's common stock during the Relevant Time Period."

(j)    "All Documents and Communications Concerning the drafting, editing, review and approval of MGT's Form 8-K filed May 9, 2016."

(k)    "All Documents and Communications Concerning the paid promotion made by MGT for $125,000 for a two-month contract May 6, 2016-July 5, 2016 as disclosed by Stock Beast on May 9, 2016."

(l)    "All Documents and Communications between MGT and the following entities: a. Alpha; b. ATG; c. D-Vasive; d. Demonsaw; e. Grander; f. HS Contrarian; g. Hudson Bay; h. Iroquois; i. LFR; j. Melechdavid; and k. Stetson Capital."

---

[10] The SEC subpoena was not published by the Company, nor made publicly available. On February 9, 2017, financial journalist Teri Buhl published the subpoena on her website in connection with an article regarding MGT's receipt of the subpoena. *See Here it is: that MGT Capital SEC Subpoena*, http://www.teribuhl.com/2017/02/09/here-it-is-that-mgt-capital-sec-subpoena/ (last accessed May 13, 2019).  Honig subsequently filed suit against Ms. Buhl, Defendant Ladd, and MGT in the United States District Court for the Middle District of North Carolina and styled as *Honig v. Ladd, et al.* C.A. No. 1-17-cv-184 (M.D.N.C.) on April 3, 2017, alleging libel and slander related to the publication of the subpoena.   Honig attached a copy of the subpoena to his pleadings in that matter.

(m)"All Documents and Communications between MGT and the following individuals: a. Michael Brauser; b. John H. ford; c. Barry Honig; d. Mark Groussman; e. John Sandor Lemak; f. John R. O'Rourke III; g. Josh Silverman; h. John Stetson; and i. Jill Strauss."

137.   On September 20, 2016, pre-market, MGT announced that the NYSE had informed the Company on September 19, 2016 that it would "not approve the listing on the Exchange of the 43.8 million shares that the Company is required to issue in order to complete the closing of the D-Vassive [sic] merger." The press release insisted that "[t]he Company and John McAfee remain committed to closing the transaction and are exploring alternatives." Later that day, MGT posted a statement on its website[11] stating in relevant part:

> Now that shares are blocked for D-Vasive, what options are there to retain to proceed with the acquisition? How will this impact the acquisition of Demonsaw and involvement of MGT's Chief Technical Officer, Eric "Eijah" Anderson?
>
> The New York Stock Exchange is not allowing us to issue shares to the sellers of D-Vasive. However, MGT still has fully proper and legal options to consummate the merger away from the NYSE. To be clear, their decision was not related to any securities regulations, but rather the NYSE's own internal rulings.
>
> The acquisitions have been approved by shareholders, the MGT board, and corporate officers. Considering this support for the acquisitions, MGT has stated unequivocally that it will still pursue closing the acquisition of D-Vasive, a provider of leading edge anti-spy software, and Demonsaw, a provider of a secure and anonymous file sharing software platform. Both products are critical to the success of MGT, and without which we cannot proceed with our Company's vision.
>
> Most importantly, Mr. McAfee and Mr. Anderson are fully committed to going forward and building our Company as Chief Executive Officer and Chief Technology Officer, respectively.

138.   On this news, MGT stock fell $0.63, or 25%, to close at $1.89 on September 20, 2016.

---

[11] MGT Capital Investments, Inc., *MGT Further Clarifies SEC Subpoena, NYSE And Other Top Shareholder Questions*, Sept. 20, 2016, https://www.mgtci.com/datastreamx/2016/9/20/ shareholder-frequently-asked-questions

139.     On September 22 and 23, 2016, financial investigative journalist Teri Buhl issued separate articles for *The Growth Capitalist*[12] and on her personal website[13] discussing MGT's receipt of the SEC subpoena and specifically identifying the requested documents as being related to communications between MGT and Barry Honig, and identifying Honig's relationship with Brauser.

140.     On Ms. Buhl's reporting, which was subsequently corroborated by the publication of the subpoena document and pending SEC Action, MGT's common stock dropped from $2.30 per share to $2.01 per share on September 26, 2016—a two day drop of 12%.

141.     On October 19, 2016, shortly before market close, the NYSE MKT issued a press release stating that "the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of MGT…from the Exchange. Trading in the Company's common stock on the NYSE MKT will be suspended immediately." The press release further stated that "NYSE Regulation has determined that the Company is no longer suitable for listing" and had "commenced delisting proceedings pursuant to Section 1002(c) of the NYSE MKT Company Guide that applies when a company has sold or otherwise disposed of its principal operating assets, or has ceased to be an operating company."

142.     At 9:18 am EDT on October 20, MGT issued a press release stating that it was considering appealing the delisting and that MGT's common stock would begin trading over the counter under the symbol "MGTI."

---

[12]     Teri   Buhl,   *SEC   Investigating   trading   by   PIPE   Investors   in   MGT   Capital*, https://www.scribd.com/document/368501165/SEC-Investigating-Trading-by-PIPE-Investors-in-MGT-Capital-9-22-16-Growth-Capitalist (last accessed March 12, 2019)
[13] Teri Buhl, *MGT Capital receives SEC Subpoena Seeking Information about Barry Honig and Eight Other Individuals*,     http://www.teribuhl.com/2016/09/23/mgt-capital-receives-sec-subpoena-seeking-information-about-barry-honig-and-eight-other-individuals/ (last accessed May 13, 2019)

143.    On October 21, 2016, the stock closed at $1.29, down 45% from MGT's close of $2.35 on October 19, 2016.

**B.  The SEC Announces its Suit Against the Scheme Group and its Affiliates**

144.    On September 7, 2018, the SEC issued a press release announcing that it had initiated an action against ten individuals and ten associated entities, including each member of the Scheme Group, for their participation in "long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock."   The press release, titled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes" stated, in relevant part:

> The Securities and Exchange Commission today charged a group of ten individuals and ten associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.
>
> According to the SEC's complaint, **from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes.** Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes. **Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors.**
>
> The SEC's complaint, which was filed in federal district court in Manhattan, charges **Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman**, Frost, Elliot Maza, **Robert Ladd**, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants, Inc., HS Contrarian Investments, LLC, Grander Holdings, Inc., Melechdavid, Inc., OPKO Health, Inc., Frost Gamma Investments Trust, Southern Biotech, Inc., and Stetson Capital Investments Inc. with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief.

145.     Also on September 7, 2018, the Company issued a press release, commenting on the SEC news and stating, in relevant part:

> Robert Holmes, Chairman of the Board of Directors stated, "MGT and its officers and directors have complied with their obligations under the subpoenas issued by the SEC in September 2016 and December 2017, which the Company previously disclosed in its public filings, and otherwise cooperated with the investigation. We find it unfortunate that the Commission chose to file a complaint against Mr. Ladd without first affording him the opportunity to formally address its allegations."

> Mr. Holmes concluded, "The Company was not named as a defendant in the SEC complaint and we would like to assure investors that the operations and activities of the Company are not affected by the SEC action."

146.     On this news, the Company's common stock fell from a closing price of $0.59 on September 6, 2018, to $0.44 per share on September 7, 2018, down to $0.40 per share on September 10, 2018 – a one day drop of 25% and a two trading day drop of 32%.

## POST-CLASS PERIOD EVENTS

### A.  John McAfee Departs MGT

147.     Despite being touted by the Company as "the visionary pioneer of internet security [who] sold his anti-virus company to Intel for $7.6 billion, and [who] is actively involved in the development of new measures to protect individual freedoms and privacy," the McAfee-led MGT continued to flounder as it supposedly pivoted from cybersecurity to cryptocurrency mining.

148.     In January 2018, the Company announced that it had severed its relationship with McAfee (who, to that point, had taken on the role of "Chief Cybersecurity Visionary" of the Company after holding the role of CEO from November 2017 to August 2017) and announced that it would be considering various options for its cybersecurity business, including a sale or spinoff.

149.     On March 19, 2018, the Company announced the end of its cybersecurity operations and the sale of its cybersecurity assets for $60,000 in cash and a $1 million promissory note, convertible into a 20% equity interest in the buyer.

**B.  The SEC Prosecutes its Action Against the Scheme Group**

150.    On September 7, 2018, the SEC initiated the SEC Action against, among others, each member of the Scheme Group, in the United States District Court for the Southern District of New York.

151.    On September 10, 2018, the Company announced that Defendant Ladd would be taking a leave of absence "to focus on addressing the allegations in an SEC Complaint filed on Friday September 7, 2018."

152.    On February 6, 2019, a consent judgment was entered in the SEC Action against Groussman and his controlled entity Melechdavid.  In connection with the consent judgment, Groussman was permanently restrained and enjoined from any future violations of Sections 10(b) and 13(d) of the Exchange Act and Sections 17(a) and 5 of the Securities Act of 1933.  Further, Groussman consented to his liability for the disgorgement of $1.051 million, "representing profits gained as a result of the conduct alleged" in the SEC Action (including his pump-and-pump sales of MGT stock, as alleged above), $170,554.78 in prejudgment interest, and a civil penalty in the amount of $160,000.

**ADDITIONAL SCIENTER ALLEGATIONS**

153.    As alleged herein, Defendant Ladd acted with scienter in that he knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as a primary violator of the federal securities laws.

154.    For example, Defendant Ladd was well aware of the Scheme Group's plans for the Company and desire to hide their collective holdings, having previously participated in and/or recklessly accepted the Control Group's exploitation of the Company's common stock through a separate pump and dump scheme in 2012 and 2013.  *See supra*, Section B.1.

155.    Further, in advance of the Control Group's October 2015 investment, Defendant Ladd emailed Honig about the identity of the buyers in the $700,000 capital raise, acknowledging that "$175,000 x 4 investors will each be at 4.9%"—a key threshold the Scheme Group sought to stay under so as to not raise the mandatory reporting requirements.  While Honig initially responded to Defendant Ladd's inquiry (copying Brauser and Stetson) with the direction to "for now use Barry Honig Mike Brauser [and] OBAN [an LLC created by Stetson]," his direction was superseded by an October 5, 2015 email by Stetson with a new list of investors, including GRQ (Honig), Grander (Brauser), SCI (Stetson) and ATG (O'Rourke).

156.    Thus, the manipulation of the ownership group was made crystal clear to Defendant Ladd in these emails, and he knew or recklessly disregarded that the individuals investing in the Company were operating as an undisclosed Control Group that had acquired their Company shares together and were collectively exercising their control over MGT.

157.    Defendant Ladd's knowledge and/or reckless disregard for this fact is further supported by his November 2015 message to Honig wherein he stated, "As for the cap table, we have 17.2 million common shares outstanding, including ***your group's*** 2.8 million . . . ."

158.    Yet despite noting that the Honig-led group controlled approximately 16.2% of the Company's outstanding common stock at that point, on November 19, 2015, Ladd caused a definitive proxy statement to be filed by the Company with the SEC that reported the Company's common stock outstanding as 17,199,665 shares as of November 16, 2015, and the Company's

5% beneficial owners consisting **only** of Iroquois Capital Management, LLC at 8% and Barry Honig at 7%—a falsehood that Ladd would continue to perpetuate through the Class Period, as alleged herein.

159.    Further, Defendant Ladd acted with scienter in that he knew or recklessly disregarded the existence of the pump and dump scheme, having orchestrated the Company's wire payment of $125,000 to a well-known stock promoter at the direction of Honig as an up-front payment for the promotion of MGT on or around January 21, 2016.

160.    Defendant Ladd had the opportunity to commit and participate in the wrongful conduct complained of herein. At all times relevant hereto, he was a senior executive officer and director of MGT and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings.   As a result, Defendant Ladd could falsify the information that reached the public about the Company's primary stockholders and the presence of an undisclosed Control Group which was dictating the Company's actions.

161.    Further, at the time the Company issued the $125,000 wire payment to the stock promoter at the direction of Honig in January 2016, Defendant Ladd was **the sole executive** of the Company, occupying the role of both chief executive officer and interim chief financial officer. Additionally, as MGT stated in the April 2016 Annual Report filed with the SEC on April 14, 2016, at that point in time the Company and its subsidiaries had **just two employees**—further supporting the inference that Defendant Ladd had unchecked control over the day-to-day actions of the Company.

162.    Throughout the Class Period, Defendant Ladd acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein.   Such actions allowed the artificial inflation of the Company's stock price and allowed Defendant Ladd to reap a financial

windfall through his various stock sales, taking proceeds of more than $555,000 through stock sales timed to coincide with the Scheme Group's Promotional Articles and the Company's false and misleading statements.

163.    Additionally, the magnitude of Defendant Ladd's stock sales in relation to his overall holdings further supports an inference of scienter.  According to the Form S-1/A Amended Registration Statement filed with the SEC on January 13, 2016, as of January 12, 2016, Defendant Ladd owned 273,603 shares of MGT common stock directly and was the beneficial owner of an additional 622,471 shares held by Laddcap Value Partners III LLC, a Delaware LLC for which he was the Managing Member. Thus, his sales in response to the February Promotional Article (which brought much needed liquidity to the market for the Company, as its stock averaged just 96,000 shares transacted in the ten trading days prior to the February 3, 2016 pumping article, as compared to nearly 520,000 shares per day in the ten days after) constituted a liquidation of more than 10% of his total MGT holdings.

164.    Further, Defendant Ladd capitalized to an even greater extent following the May Promotional Article (which Ladd, through the Company, paid for) and the Company's false statement about John McAfee's prior business success, over which Ladd had total control as MGT's only executive officer and as one of just two MGT employees at the time.  Thereafter, Ladd sold 471,000 shares of MGT stock within his control for proceeds of $516,554.  Based on Ladd's reported beneficial ownership of 896,074 shares of MGT stock as of April 11, 2016, Ladd's post-promotional and false statement sales equaled ***more than 52% of his total holdings*** and were designed to exploit the artificial inflation and liquidity injected in the market that saw the Company's trading volume boom from an average of 118,000 shares traded in the ten trading days

preceding the May 9, 2016 announcement to **_nearly 49 million shares per day_** in the ten trading days thereafter.

165.   Defendant Ladd was additionally complicit in the Scheme Group's exploitation of the now-inflated MGT stock price following the May 2016 Promotional Article and the Company's false statement about McAfee, negotiating with Honig, Brauser, Stetson and O'Rourke between May 10 and 12, 2016 for the early exercise of each's warrants, filling the other members of the Scheme Group's stock coffers to allow them to dump those shares into the market for millions in profits.

166.   As alleged herein, Defendant Ladd was acting in his capacity as the Chief Executive Officer and/or Chief Financial Officer when he knowingly or recklessly approved the payment to the Control Group's handpicked stock promoter for touting articles and concealed these facts from the public.

167.   Further, Defendant Ladd was acting in his capacity as the Chief Executive Officer and/or Chief Financial Officer when he knowingly or recklessly disregarded materially false statements and omissions regarding the Control Group in the Company's SEC filings, as set forth herein.

168.   The scienter of MGT's employee (Ladd) is imputed to MGT under the doctrine of _respondeat superior_ and common law principles of agency.

## **LOSS CAUSATION**

169.   The market for MGT's common stock was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, MGT stock traded at artificially-inflated prices during the Class Period.

170.    Plaintiffs and other members of the Class purchased or otherwise acquired MGT stock relying upon the integrity of the market of MGT and market information related to the Company, and have been damaged thereby.

171.    As Defendants' misrepresentations and fraudulent conduct was disclosed and became apparent to the market, the artificial inflation in the price of MGT's securities was removed, and the price of MGT shares fell.

172.    On October 9, 2015, MGT announced the Honig-led investment, without divulging that the Control Group would be acting in concert.  As a result of this announcement, the Company's common stock rose from $0.26 per share on October 8, 2015 to $0.36 per share on October 9, 2015—an increase of 38%.

173.    On February 3, 2016, the first promotional article directed by the Control Group was issued as the initial pump, raising the Company's stock price to an intraday high of $0.58 per share on that day.

174.    On May 9, 2016, the Company issued the materially false and misleading statement in connection with the announcement of the D-Vasive asset purchase agreement and the second promotional article directed by the Control Group was issued.  On this news, the Company's common stock rose substantially on that day and over the next several trading days from $0.37 per share on May 6, 2016 on 71,000 shares traded to:

>    a.    $0.48 on May 9, 2016—a 33% increase over the previous day on more than 10 million shares traded—after opening at $0.64 per share based, in part, to the Scheme Group's manipulative pre-market coordinated trades;
>
>    b.    $0.73 on May 10, 2016—a 52% increase over the previous day;
>
>    c.    $1.28 on May 11, 2016—a 75% increase over the previous day;

    d.   $1.51 on May 12, 2016—an 18% increase over the previous day;

    e.   $1.72 on May 13, 2016—an 14% increase over the previous day;

    f.   $2.96 on May 16, 2016—a 72% increase over the previous day;

    g.   $4.15 on May 17, 2016—a 40% increase over the previous day on more than 109 million shares traded.

175.    The artificial inflation caused by the violations of the Exchange Act alleged herein began to exit the market and damage investors over the course of several partial disclosures.

176.    On September 19, 2016, prior to the market opening, the Company announced that it was in receipt of a subpoena from the SEC.  The Company's common stock responded, dropping from a closing price of $3.26 per share on September 16, 2016 to a close of $2.52 per share on September 19, 2016—a drop of 23%.

177.    The Company's common stock price continued to drop over the next several days as financial journalist Teri Buhl linked the SEC subpoena with MGT's relationship with Honig, identifying Honig as orchestrating several pump and dump schemes.  This revelation caused MGT's stock price to drop from $2.30 per share on September 21, 2016 to $2.01 per share on September 26, 2016, a drop of 12.6%.

178.    On September 9, 2017, Teri Buhl published the contents of the subpoena on her website, further linking the Company to Honig and the Scheme Group, as well as the authors of the promotional articles.  On this publication, the Company's common stock dropped more than 7%, from $0.71 per share on February 8, 2017 to $0.66 per share on February 9, 2017.

179.    Finally, on September 7, 2018, the SEC issued a press release announcing the filing of its complaint against the Scheme Group, among others, for their efforts to manipulate the common stock of MGT, along with two other companies, in the manner alleged herein.  The

announcement caused the Company's stock to drop from a closing price of $0.59 per share on September 6, 2018 to $0.44 per share on September 7, 2018 (a loss of 25%), and it has continued to drop daily to current levels of approximately $0.076 per share.

180.   As a result of their purchases of MGT stock during the Class Period at artificially-inflated prices, Plaintiffs, and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price declines in MGT stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

## PRESUMPTION OF RELIANCE

181.   At all relevant times, the market for MGT common stock was efficient for the following reasons:

(a)   MGT common stock met the requirements for listing, and was listed and actively traded, first on the NYSE MKT, and then the OTC Link, each a highly efficient and automated market;

(b)   As a regular issuer, MGT filed periodic reports with the SEC; and

(c)   MGT regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

182.   As a result of the foregoing, the market for MGT securities promptly digested current material information regarding MGT from all publicly available sources and reflected such information in MGT's stock price. Under these circumstances, all purchasers of MGT securities

during the Class Period suffered similar injury through their purchase of MGT securities at artificially-inflated prices, and a presumption of reliance applies.

183.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

184.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

185.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

186.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

187.    To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, and the particular speaker actually knew that the statement was false or misleading.

## CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired MGT securities during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

189.    Excluded from the Class are MGT and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

190.    Because MGT had millions of shares of common stock outstanding during the Class Period, and because its securities were actively traded, first on the NYSE then the OTC Link, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are, at a minimum, hundreds of Class members. Members of the Class may be identified from records maintained by MGT or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

191.    Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

192.    Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.

193.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

(a) Whether Defendants violated the federal securities laws as alleged herein;

(b) Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about MGT's beneficial ownership interest;

(c) Whether the price of MGT's securities was artificially inflated during the Class Period; and

(d) The extent to which members of the Class have sustained damages and the proper measure of damages.

194.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

## COUNT I

**(Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Against MGT and Ladd)**

195.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

196.    This Count is asserted against defendants MGT and Ladd (the "Count I Defendants") and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

197.    During the Class Period, the Count I Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and

failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

198.    The Count I Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) in that they:

a.   employed devices, schemes and artifices to defraud;

b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in acts, conspiracies, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of MGT common stock during the Class Period.

199.    Ladd is named as a defendant for this count for all false statements contained in MGT's SEC filings as he either signed the document in question or was one of just two (and sometimes, the only) executive of the Company at the time the statement was made.  Defendant MGT is named as a defendant for all false statements made during the Class Period alleged herein.

200.    The Count I Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of MGT were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Count I Defendants, by virtue of their receipt of information reflecting the true facts of MGT, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading

statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning IMUC, participated in the fraudulent scheme alleged herein.

201.    MGT is liable for false statements issued in the name of the Company, including its SEC filings and statements issued with its consent.

202.    Ladd, as CEO of MGT, is liable for false statements in signed documents submitted to the SEC.

203.    As a result of the foregoing, the market price of MGT common stock was artificially inflated during the Class Period.  Unaware of the falsity of the statements by the Count I Defendants, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of MGT common stock during the Class Period in purchasing MGT common stock at prices that were artificially inflated as a result of the false and misleading statements by Defendants.

204.    Had Plaintiffs and the other members of the Class been aware that the market price of MGT common stock had been artificially and falsely inflated by the Count I Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased MGT common stock at the artificially-inflated prices that they did, or at all.

205.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

206.    By reason of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of MGT common stock during the Class Period.

## COUNT II

### (Violations of §10(b) of the Exchange Age and Rule 10b-5(a) & (c)

### Against defendants MGT and Ladd

207.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

208.    During the Class Period, defendants MGT and Ladd (the "Count II Defendants"), violated Rules 10b-5(a) & (c) in that they, in concert with Honig, Stetson, Brauser, O'Rourke, and Groussman, employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of MGT publicly traded common stock during the Class Period as alleged in.

209.    The Count II Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MGT's value, performance, and continued substantial growth.  As set forth more particularly herein, these acts included: (i) entering into an undisclosed financing agreement that allowed the members of the Control Group to outwardly appear to own separate and independent blocks of Company stock below the 5% reporting threshold so to as to obfuscate the nature of the Control Group's true ownership; (ii) directing and engaging in a Company-paid promotional scheme through the use of known stock promoters designed to pump MGT's stock and allow the members of the Control Group and Defendant Ladd to unload large blocks of Company stock into the market at inflated prices; (iii) the agreement by and among Defendant Ladd and the Control Group to accelerate and facilitate the warrant exercises of the members of the Control Group in May 2016, allowing the group to

capitalize on the artificial inflation in the Company's stock price and sell millions of shares of MGT stock for more than $9.4 million  These practices and course of business operated as a fraud and deceit upon the purchasers of MGT securities during the Class Period.

210.    Prior to and during the Class Period, the Scheme Group worked in concert to hire writers to prepare and publish paid promotional articles promoting MGT stock, but failed to disclose such review or the writers' payment for their articles.  The purpose of the engagement was simple: to artificially inflate the price of MGT stock to allow the Scheme Group to dump millions of shares into the market at artificial prices and exploit the members of the Class.

211.    Honig organized the stock promotions, with the approval and consent of the other members of the Scheme Group, and directed the payment of Company funds to the stock promoter through Defendant Ladd.

212.    Defendant Ladd used his unchecked position as Chief Executive Officer and Interim Chief Financial Officer to direct hundreds of thousands of MGT's dollars to the stock promoters, knowing or recklessly disregarding that such individuals would omit reference to the source of their payment and that such promotional articles were the "pump" that preceded the Scheme Group's "dump."

213.    Publication of the MGT Articles were timed to take advantage of and amplify good news.

214.    As a result of the Count II Defendants' fraudulent scheme, and failure to disclose material facts, as set forth above, the market price of MGT securities was artificially inflated during the Class Period.

215.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially-inflated prices for MGT publicly traded common stock.

Plaintiffs and the Class would not have purchased MGT publicly traded common stock at the prices they paid, or at all, had they been aware that the market prices for MGT common stock had been artificially inflated by the Count II Defendants' materially false and misleading statements and omissions and the attendant scheme or artifice designed to defraud.

## COUNT III

### (Violations of §20(a) of the Exchange Act Against Defendant Ladd)

216.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

217.    Defendant MGT violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

218.    Defendant Ladd (the "Count III Defendant") acted as controlling person of MGT within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of MGT's operations and/or intimate knowledge of the Company's actual performance, the Count III Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein.

219.    During the Class Period, the Count III Defendant participated in the operation and management of MGT, and conducted and participated, directly and indirectly, in the conduct of MGT's business affairs.  Because of his senior position, he knew the adverse non-public information about MGT's misstatement and false statements.

220.    As an officer and/or director of a publicly-owned company, the Count III Defendant had a duty to disseminate accurate and truthful information with respect to MGT financial

condition and results of operations, and to correct promptly any public statements issued by MGT which had become materially false or misleading.

221.    The Count III Defendant, therefore, acted as a controlling person of MGT.  By reason of his senior management positions and/or being a director of MGT, the Count III Defendant had the power to direct the actions of, and exercised the same to cause, MGT to engage in the unlawful acts and conduct complained of herein.  The Count III Defendant exercised control over the general operations of MGT and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

222.    By reason of the above conduct, the Count III Defendant is liable pursuant to §20(a) of the Exchange Act for the violations committed by MGT.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as representatives of the Class;

B.    Awarding Plaintiffs and the members of the Class damages, including interest;

C.    Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demands a jury trial of all issues involved, now, or in the future, in this action.

Dated:  May 14, 2019                          /s/ *Shannon L. Hopkins*
                                              _____

                                              **LEVI & KORSINSKY LLP**
                                              Shannon L. Hopkins (SH-1887)
                                              Sebastiano Tornatore (ST-0304)
                                              55 Broadway, 10th Floor
                                              New York, New York 10006
                                              Telephone: (212) 363-7500
                                              Facsimile: (212) 363-7171

                                              - and -

                                              Donald J. Enright
                                              Elizabeth K. Tripodi
                                              John A. Carriel
                                              1101 30th Street, N.W., Suite 115
                                              Washington, DC 20007
                                              Telephone: (202) 524-4290
                                              Fax: (202) 333-2121

                                              *Lead Counsel for Lead Plaintiff and the Class*
                                              *Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May, 2019, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/Shannon L. Hopkins*

Shannon L. Hopkins